OPINION
{¶ 1} Appellant, Dwayne A. Stoutamire, appeals from the August 1, 2007 judgment entry of the Trumbull County Court of Common Pleas, which sentenced him to a consecutive, aggregate sentence of thirty-four years after he was found guilty by a jury. For the following reasons, we affirm.
 {¶ 2} Substantive Facts and Procedural History *Page 2 
 {¶ 3} On March 16, 2007, the grand jury returned a superseding indictment against appellant ("Mr. Stoutamire") for attempted murder, a felony of the first degree with a firearm specification, in violation of R.C. 2923.02(A) (E), 2903.02(A) (D), and 2941.145; two counts of having a weapon while under disability, felonies of the third degree in violation of R.C. 2923.13(A)(3) (B); one count of felonious assault with a firearm specification, in violation of R.C. 2903.11(A)(2) (D) and2941.145; one count of abduction, a felony of the third degree in violation of R.C. 2905.02(A)(1) (B) and 2941.145; and one count of aggravated robbery, a first degree felony in violation of R.C. 2911.02(A)(1) (C) and 2941.145.
 {¶ 4} The charges raised against Mr. Stoutamire stem from two separate incidents that occurred on January 9, 2007 and February 19, 2007. Over the course of the trial, the jury heard testimony from twenty-nine witnesses; twenty-eight presented by the state and one presented by the defense.
 {¶ 5} The Shooting Incident
 {¶ 6} The testimony and evidence reflects that on January 9, 2007, a robbery shooting occurred at an apartment complex in Warren at approximately 11:00 p.m. The victim, Antonio Peterman ("Mr. Peterman"), was shot in the thigh and stomach, while he was in his car in the parking lot of the apartment complex.
 {¶ 7} David Palm ("Mr. Palm"), along with his wife, Jami Lynn, and his mom, Sally Jo, had driven to Mr. Peterman's girlfriend's apartment complex in order to purchase some crack cocaine. Knowing Mr. Peterman was quite particular about the condition of his Cadillac and as snow was beginning to fall, Mr. Palm entered Mandy Stewart's ("Ms. Stewart") apartment and informed Mr. Peterson that his car window was *Page 3 
rolled down. Mr. Palm then purchased $315 of crack and left $320 on the kitchen table before leaving since Mr. Peterman did not have change.
 {¶ 8} Ms. Stewart testified that about five minutes later Mr. Peterman put on his winter jacket and went outside to attend to the car window as snow was now heavily falling. She heard gunshots and looked out the window. But when she saw the dome light on in his Cadillac and Mr. Peterman moving about in the car with the car door open, she assumed the shots had nothing to do with her boyfriend. She did see Mr. Palm driving away in his own car. About two minutes later neighbors began beating on her door, informing her that Mr. Peterman had been shot and that 911 had already been called.
 {¶ 9} The neighbors, September Allen ("Ms. Allen"), Felicia Mitchell ("Ms. Mitchell"), and Marquerita Patterson ("Ms. Patterson"), had been playing X-box in Samantha Bumbico's ("Ms. Bumbico") apartment when they heard the gunshots. Ms. Mitchell heard someone yell from inside the apartments that somebody had been shot. As they headed outside, Ms. Allen called 911 and then passed the phone to Ms. Mitchell. Ms. Allen saw someone wearing a "hoodie" leave the front seat of Mr. Peterman's car and start running towards the A building. Ms. Bumbico saw two people standing in front of the Cadillac who then began running separate ways, one towards the right of the A building, and one towards the left. One was wearing a dark hoodie, while the other was wearing a red one. She saw them both run in the direction of a red car. She then went outside and as she was in the rear seat of the Cadillac with Mr. Peterman, she saw the headlights of a vehicle leaving. *Page 4 
 {¶ 10} Other neighbors also witnessed the shooting. Marquerita Patterson, who lived in the A building, saw someone running towards her building. She later went outside and noticed footprints in the snow. Peggy McClintock, who lived in the D building, heard glass break. When she looked out the window she saw a person running from in between the cars. That person fell on the snow, and she saw that he had a gun in his hands. Ms. Mary Anderson, who lived in the same building as Ms. Stewart, the C building, also heard two or three gunshots, but observed nothing when she looked outside the window.
 {¶ 11} Sergeant Martin Gargas ("Sergeant Gargas") was the first to arrive on the scene. He observed that Mr. Peterman appeared to be in shock. When asked who did this, Mr. Peterman replied that he did not know. Sergeant Gargas noticed shell casings outside of the car that were later identified as being from a .40 caliber weapon.
 {¶ 12} EMS soon arrived on the scene, and Julie Knowlton ("Ms. Knowlton") attended to Mr. Peterman. He was breathing heavily, but still talking and complaining of pain. The back passenger door was open, and she observed a gunshot wound to his right thigh. On further examination she discovered a wound to his abdomen. As they transported Mr. Peterman to Trumbull Memorial Hospital, he began to have difficulty breathing and then stopped breathing altogether. Although the rescue team revived him, he remains in a comatose state today.
 {¶ 13} Dr. Stantucio Ricciardi, Mr. Peterman's physician, testified that Mr. Peterman has a resultant severe brain injury. He cannot communicate, swallow, eat, or breathe on his own and is receiving nutrition by way of a feeding tube. *Page 5 
 {¶ 14} When Detective Wayne Mackey ("Detective Mackey") arrived at the scene, Mr. Peterman was already en route to the hospital. Surveying the scene, he observed two sets of footprints around building A. One tracked around the right side of the building, the other around the left.
 {¶ 15} Detective Sergeant Michael Merritt ("Detective Merritt"), a crime scene investigator, arrived at the scene and took custody of the two shell casings. He observed that the driver's side window of Mr. Peterman's Cadillac was blown out and that blood was everywhere, but no blood samples were taken for testing. Due to the snow storm, no fingerprints were recovered. The footprints were not photographed because none were legible, having been quickly erased by the snow.
 {¶ 16} When Ms. Stewart returned to her apartment, the $320 Mr. Palm had left on the table was missing.
 {¶ 17} The Domestic Dispute
 {¶ 18} The second incident occurred on February 19, 2007. At about 3:00 a.m. Mr. Stoutamire's girlfriend, Jessica Gordon ("Ms. Gordon"), had been drinking heavily with a girlfriend, "Jen," who dropped her off at Mr. Stoutamire's mother's home. Mr. Stoutamire was in his mother's car, and Ms. Gordon stepped out of Jen's car into Mr. Stoutamire's car. As the couple drove around the city, Ms. Gordon continued to drink and they began arguing about whether she was sleeping with Mr. Stoutamire's friend, "Red." Mr. Stoutamire grew very angry and drove her to Red's house. The couple went into Red's house. Mr. Stoutamire left, and returned a couple of minutes later, and ordered to Ms. Gordon: "Let's go," as he dragged her out of the house. *Page 6 
 {¶ 19} Ms. Gordon testified that she would have left with him peacefully had he been calm. Instead he pulled her out of the house by her coat, ripping the arms and sleeves. The two began fist-fighting, and Mr. Stoutamire hit her in the face, giving her a black eye and a swollen lip. Mr. Stoutamire put her in the car. She tried to get out, but Mr. Stoutamire, with a .38 special in hand ordered her to get in the car, saying "Get in the car. You want to get shot?" When the police arrived she ran to them crying hysterically. She told them that Mr. Stoutamire had a gun, and they arrested him.
 {¶ 20} The police had been called to the scene by Red's neighbors. Neighbor, Annette Walton, heard a girl screaming. She did not know who called the police, but three police vehicles eventually arrived on the scene. When the first car arrived, she saw a girl, presumably Ms. Gordon, throw herself on the car and cry, "Help me, help me." Patrice Rice ("Ms. Rice"), another neighbor, called 911 when she saw that Mr. Stoutamire had a gun. She observed Mr. Stoutamire trying to force Ms. Gordon out of the car, and she saw him pull out a gun and put it by her head.
 {¶ 21} Officer Jeffrey A. Miller ("Officer Miller") received the dispatch regarding the dispute at approximately 3:39 a.m. When he arrived on scene, Ms. Gordon jumped out of the car and told him that Mr. Stoutamire had a gun and was trying to kill her. She appeared "beat up" with a bloody lip, red face, and a torn shirt. Officer Sean Stephens ("Officer Stephens") was the second officer to arrive on the scene. After detaining Mr. Stoutamire, he checked the vehicle, and located a silver revolver, a .38 special, with a wooden handle under the driver's seat of the vehicle.
 {¶ 22} The Domestic Dispute Produces a Lead in the ShootingInvestigation *Page 7 
 {¶ 23} Ms. Gordon then met with Detective Michael Krafcik ("Detective Krafcik"). After discussing the events of the domestic dispute, she began discussing the events surrounding the robbery shooting. She told Detective Krafcik that on January 9th, she was getting a tattoo and received a call from Mr. Stoutamire and his friend, Fred Brady ("Mr. Brady"). They told her that they needed a ride. When she picked them up they both appeared "nervous and antsy." She dropped Mr. Brady off near Trumbull Memorial Hospital and noticed that Mr. Brady was carrying a plastic bag of what appeared to be clothes. She dropped Mr. Stoutamire at her home and returned to the tattoo artist. When she later returned home, Mr. Stoutamire told her "that Fred had — they were supposed to rob someone" and that someone had been shot in the leg and side. He also told her that "we think the guy was dead." When asked whether Mr. Stoutamire said who did the shooting, she testified that Mr. Stoutamire said, "We." Mr. Stoutamire then told her that he did not "get anything" from the robbery. She noticed that Mr. Stoutamire had small red drops of what appeared to be blood on his jeans.
 {¶ 24} After she finished relaying this information, Ms. Gordon gave Detective Krafcik five bullets in a brown paper bag, together with a plastic bag of clothes that were supposedly Mr. Brady's. The bullets were later identified as fitting a .40 caliber weapon. She told Detective Krafcik that Mr. Stoutamire was currently wearing the same pair of jeans he had worn on January 9 and that Mr. Brady drove a maroon car. She also told him that she had washed the jeans at least two or three times since the night of the shooting.
 {¶ 25} During his interview with Ms. Gordon, Detective Krafcik also learned of Allen Reynolds, also known as "Skee," who is a cousin of Mr. Brady. At trial, Skee *Page 8 
testified that he was familiar with Mr. Peterman through his cousin, and that he lived about six or seven minutes away by car, or fifteen minutes on foot from Mr. Peterman's apartment. He told the jury that on the night of January 9, Mr. Brady and Mr. Stoutamire appeared at his house a little after 11:00 p.m., knocking on the door "like 20 dogs were chasing him." Mr. Brady appeared paranoid and was "throwing up." He would not tell Skee what happened, and asked for a trash bag. Mr. Brady and Mr. Stoutamire then removed their outer layer of clothes, and put them in the bag. Skee also observed red spots on Mr. Stoutamire's jeans. According to Skee, Mr. Stoutamire told him "I got into a confrontation but its all good though I only hit the dude twice in the leg and chest." Three days later, Skee discovered that Mr. Peterman had been shot.
 {¶ 26} Joseph Brown ("Mr. Brown"), an associate of Mr. Stoutamire and Mr. Brady, testified that on the night before the shooting, on January 8, he, Mr. Brady, and Mr. Stoutamire were discussing possible robbery targets. Mr. Brady went down a list of names and mentioned Mr. Peterman. Mr. Stoutamire then remarked that he was "willing to hit anybody" and that "he was thirsty to do a lick." Mr. Brown claimed they "were just BS-ing."
 {¶ 27} Forensic testimony was offered by Brenda Gerardi, a scientist for the Ohio Bureau of Criminal Identification and Investigation ("BCII"). She conducted a DNA analysis on the clothing in the bags provided to the police by Ms. Gordon, and on Mr. Stoutamire's jeans. She found mixed partial DNA of Ms. Gordon and Mr. Stoutamire on the jeans, but no DNA from either Mr. Brady or Mr. Peterman. She indicated that DNA can be washed out of clothes. *Page 9 
 {¶ 28} Donna Rose ("Ms. Rose"), of BCI's trace evidence unit, conducted gunshot residue ("GSR") tests. Samples were obtained from the three members of the Palm family and another man who was with them that night, Michael McClain. Only Mr. Palm tested positive for particles that are indicative of GSR, but as Ms. Rose testified, that does not necessarily mean he handled a gun. Rather, she explained he could have been near a gun when it went off or handled an item that had GSR on it. Mr. Palm testified that he and his entourage did go to Mr. Peterman's apartment in his red jeep to buy cocaine, but denied handling a firearm that night.
 {¶ 29} Tara Talbert ("Ms. Talbert") testified for the defense as an alibi witness. Mr. Stoutamire is her godmother's son, and Mr. Reynolds, as well as Mr. Brady, are relatives. She had been staying on and off at Mr. Stoutamire's mother's house because her child had burned down her home a few days before. On the night of January 9 she testified that she heard Mr. Stoutamire leave at around 11:30 p.m., but she was unsure as to the exact time. Ms. Talbert met Ms. Gordon through Mr. Brady, who at the time was dating Mr. Brady. Ms. Gordon, however, denies that she was ever involved with Mr. Brady. Ms. Talbert also testified that she saw Ms. Gordon on the night of the shooting at a friend's house who lived about three doors down, and that Ms. Gordon showed her the new tattoo she had just received, which depicted Mr. Stoutamire's nickname, "Ziggy."
 {¶ 30} Procedural Issues During Trial
 {¶ 31} It must be noted that Ms. Gordon failed to appear on the day she was scheduled to testify. Detective Krafcik testified in camera that Ms. Gordon was being harassed by Mr. Stoutamire's sister, Keke. Someone had posted signs all over the *Page 10 
projects, displaying her phone number and inappropriate comments about Ms. Gordon. A material witness warrant was issued and Ms. Gordon did appear the next day.
 {¶ 32} Before and throughout trial, the defense made several motions asserting prejudicial joinder of the two incidents for trial, all of which were overruled.
 {¶ 33} Further, during jury deliberations, jurors questioned whether, in regards to the count of aggravated robbery, the defendant could be found guilty without having handled a gun. In response, the court, over the defense's objections, instructed the jury on complicity.
 {¶ 34} During the trial, the jury repeatedly heard that Mr. Stoutamire had been previously found guilty for cocaine possession, and thus, a cautionary instruction concerning the jury's use of this evidence was given in the court's closing instructions.
 {¶ 35} At the time of trial, no one else had been charged in connection with the January 9 shooting.
 {¶ 36} The jury found Mr. Stoutamire guilty of felonious assault with a firearm specification, a second degree felony in violation of R.C. 2903.11(A)(2) (D) and 2941.145; abduction with a firearm specification, a third degree felony in violation of R.C. 2905.02(A)(1) (B) and2941.145; aggravated robbery with a firearm specification, a first degree felony in violation of R.C. 2911.02(A)(1) (C) and 2941.145; and on two counts of having weapons while under disability, third degree felonies, in violation of R.C. 2923.13(A)(3) (B). The jury found Mr. Stoutamire not guilty on the charge of attempted murder.
 {¶ 37} A sentencing hearing was held on August 1, 2007, in which the court sentenced Mr. Stoutamire to a thirty-four year term of imprisonment. Specifically, Mr. *Page 11 
Stoutamire was sentenced to four years each for the two counts of having a weapon while under disability; seven years for the felonious assault, with an additional mandatory, consecutive three year sentence for the firearm specification; four years for the abduction with an additional three year mandatory, consecutive sentence for the firearm specification; and finally, nine years for the aggravated robbery, with a three year mandatory, consecutive term for the firearm specification. For purposes of sentencing, the firearm specification on the aggravated robbery count was merged with the firearm specification on the felonious assault. All sentences were ordered to be served consecutive to each other for a total aggregate sentence of thirty-four years.
 {¶ 38} Mr. Stoutamire timely appeals and raises five assignments of error:
 {¶ 39} "[1.] The trial court failed to grant relief from `prejudicial' joinder under Ohio Crim. R. 14, denying Appellant a fair trial in violation of the United States Constitution Amend. V, VI, XIV and Ohio Constitution, Art. I, Sec. 10 16.
 {¶ 40} "[2.] The trial court erred when it instructed the jury on complicity after jury deliberation had begun.
 {¶ 41} "[3.] The trial court erred when it refused to give a jury instruction of unlawful restraint as a lesser included offense of abduction in violation of United States Constitution Amend. VI and XIV
and Ohio Constitution Art. I, Sec. 10 16.
 {¶ 42} "[4.] The trial court denied Appellant due process under theFourteenth Amendment in that his conviction was against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented. *Page 12 
 {¶ 43} "[5.] Appellant Was Denied His Right to a Fair Trial in Violation of United States Constitution Amend. VI and XIV as a Result of the Cumulative Error Which Occurred Throughout the Trial."
 {¶ 44} Prejudicial Joinder
 {¶ 45} In his first assignment of error, Mr. Stoutamire challenges the trial court's denial of his motion for severance due to prejudicial misjoinder. Specifically, Mr. Stoutamire contends that because the two offenses arose from two separate incidents, they were improperly tried together. He further argues that permitting the weapons under disability charges to be tried with the other offenses improperly permitted the introduction of "other acts" evidence. For the following reasons, we find these arguments to be without merit.
 {¶ 46} Prejudicial Joinder Standard of Review
 {¶ 47} "Pursuant to Crim. R. 8(A), `two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offense charged, whether felonies or misdemeanors or both, are of the same or similar character * * *.' Generally, joinder of offenses is liberally permitted in order to conserve judicial resources, prevent incongruous results in successive trials, or to diminish inconvenience to witnesses." State v. Quinones, 11th Dist. No. 2003-L-015, 2005-Ohio-6576, ¶ 35, citing State v. Torres (1981),66 Ohio St.2d 340, 343. "Thus, the law generally favors joinder of multiple offenses in a single trial." Id., citing State v. Daniels (Dec. 23, 1994), 11th Dist. No. 92-T-4730, 1994 Ohio App. LEXIS 5900, 13. *Page 13 
 {¶ 48} "However, pursuant to Crim. R. 14, it may be necessary to separate trials to prevent prejudice." Id. at ¶ 36, citing State v.Brinkley, 105 Ohio St.3d 231, 2005-Ohio-1507, ¶ 29.
 {¶ 49} Pursuant to Crim. R. 14, in relevant part: "If it appears that a defendant * * * is prejudiced by a joinder of offenses * * * for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts * * *
 {¶ 50} "When a defendant claims that joinder is improper, he must affirmatively show that his rights have been prejudiced." Crim. R. 14;Quinones at ¶ 38; State v. Roberts (1980), 62 Ohio St.2d 170, 175. "The accused must provide the trial court with sufficient information demonstrating that he would be deprived of the right to a fair trial if joinder is permitted." Id., citing State v. Lott (1990),51 Ohio St.3d 160, 163. "The state may negate the defendant's claim of prejudice by demonstrating either of the following: (1) that the evidence to be introduced relative to one offense would be admissible in the trial on the other, severed offense, pursuant to Evid. R. 404(B); or (2) that, regardless of the admissibility of such evidence, the evidence relating to each charge is simple and direct." Id. at ¶ 39, citing State v.Franklin (1992), 62 Ohio St.3d 118, 122. "The former is generally referred to as the `other acts test,' while the latter is known as the `joinder test.'" Id., citing Lott at 163.
 {¶ 51} "In State v. Lott, the Supreme Court of Ohio held that under `the "joinder" test, the state is not required to meet the stricter "other acts" admissibility test, but is merely required to show that evidence of each crime joined at trial is simple and direct.'" Id. at ¶ 16, see, also, State v. Brinkley, 105 Ohio St.2d 231, 2005-Ohio-1507, ¶ 30.
PGPage 14
 {¶ 52} "The standard for granting or denying separate trial is an abuse of discretion which should be so exercised as to prevent injustice and secure the applicant of his right to a fair trial." State v.Bowens (Aug. 9, 1991), 11th Dist. No. 89-A-1463, 1991 Ohio App. LEXIS 3792, 26, citing State v. Perod (1968), 15 Ohio App. 2 115; State v.Dingus (1970), 26 Ohio App. 2d 131, see, also, Brinkley at ¶ 31. Abuse of discretion connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. State v. Cline, 11th Dist. No. 2007-T-0052,2008-Ohio-1500, ¶ 35. (Citations omitted.)
 {¶ 53} Joinder of the Incidents
 {¶ 54} There is no question that much of the evidence relating to each incident would be inadmissible if the cases were tried separately as the two incidents are separate and distinct. The January 9 aggravated robbery concerned an entirely different crime from the February 19 abduction. Indeed, the two are linked only by the testimony of one witness, Ms. Gordon, and they occurred approximately six weeks apart and under completely different circumstances. That, however, does not conclude our analysis. Rather, the evidence that was presented at trial must be reviewed to determine whether the evidence was not so clearly separate and distinct that the presentation of the evidence prevented the jury from considering the charges as distinct from one another during one trial.
 {¶ 55} A review of the record reveals that the state presented witnesses and evidence chronologically according to the dates of the incidents. First, witnesses and evidence was presented of the robbery/shooting. The state then presented witnesses and evidence of the abduction. The only connecting evidence of the two crimes was the *Page 15 
testimony of Ms. Gordon, who provided the initial leads, admissions of Mr. Stoutamire, and the evidence of clothing and bullets to the police for use in the robbery/shooting investigation. The robbery/shooting presentation contained mostly circumstantial evidence, while the abduction was proven more directly. But the very order of trial and the very nature of the evidence were so separate and distinct that it cannot be said the jury lost its way or confused the essential elements of the crimes charged.
 {¶ 56} This court considered the issue of prejudicial joinder inState v. Quinones, supra, where the elements of the charges of gross sexual imposition and rape were so similar and the victims' allegations in the case were so similar in nature that we found that prejudice resulted from joinder. In that case, we did reverse, finding that the evidence presented for each offense would not be admissible for the other severed offense pursuant to Evid. R. 404(B) regarding prior bad acts. Id. at ¶ 47-53. The allegations and victims were so similar that it could not be said the evidence relating to each charge was separate and distinct. Id. Moreover, the presentation of witnesses at trial mingled the evidence of the separate charges. Thus, the jury could easily have confused the cases and found the appellant guilty of both incidents after condemning him for one. Thus, both the "other acts test" and the "joinder test" of Lott were implicated. Id.
 {¶ 57} We are faced with the opposite situation in this case. Only one witness, Ms. Gordon, testified and had knowledge of both incidents. Indeed, it was Ms. Gordon's statements to the police after the domestic incident that led to the investigation of Mr. Stoutamire for the earlier robbery/shooting incident. Thus, the two crimes were linked by her testimony and logically could be tried together without confusion. *Page 16 
 {¶ 58} Further, during the trial Ms. Gordon failed to appear on the day she was scheduled to testify. At an in camera hearing Detective Krafcik testified that Ms. Gordon had received harassing phone calls from Mr. Stoutamire's sister, Keke, and that someone had posted signs all over the projects where she lived displaying her phone number and inappropriate comments. The court issued a material witness warrant, and Ms. Gordon appeared and testified the following day.
 {¶ 59} Faced with a reluctant witness who was being subjected to harassment and intimidation, and further, where the evidence relating to each incident was so separate and distinct, we cannot say that the trial court abused its discretion in denying the renewed motions regarding joinder.
 {¶ 60} Weapons Under Disability Charges
 {¶ 61} As for the "other acts" evidence as it relates to the weapons under disability charges, evidence of Mr. Stoutamire's prior conviction for cocaine possession would have been admissible in both cases as they are direct, admissible and relevant evidence of the charges. Mr. Stoutamire was charged with two counts of having a weapon under a disability, felonies of the third degree in violation of R.C. 2923.13(A)(3) (B), one count for each incident. The evidence reflects that a gun was used, albeit different ones, in both incidents. Thus, his previous conviction for possession of cocaine was directly relevant and would be admissible in both cases. Moreover, the court gave a cautionary instruction on the use of the prior conviction, instructing the jury that evidence of Mr. Stoutamire's prior possession charge was to be considered only for the limited purpose of deciding whether he had been previously convicted of a drug offense. *Page 17 
 {¶ 62} It bears repeating the keen observations of Judge Learned Hand, which we noted in Quinones: "There is indeed always a danger when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all. This possibility violates the doctrine that only direct evidence of the transaction charged will ordinarily be accepted, and that the accused is not to be convicted because of his criminal disposition. Yet in the ordinary affairs of life such a disposition is a convincing factor, and its exclusion is rather because the issue is practically unmanageable than because it is not rationally relevant. When the accused's conduct on several separate occasions can properly be examined in detail, the objection disappears, and the only consideration is whether the trial as a whole may not become too confused for the jury." Id. at ¶ 54, citingU.S. v. Lotsch (C.A.2, 1939), 102 F.2d 35, 36.
 {¶ 63} We cannot say in this case that the trial court abused its discretion and that the evidence was so confusing and complex that the jury lost its way.
 {¶ 64} Mr. Stoutamire's first assignment of error is without merit.
 {¶ 65} Jury Instruction on Complicity After Deliberations hadBegun
 {¶ 66} In his second assignment of error, Mr. Stoutam ire argues that the trial court committed error in instructing the jury on complicity after the jury began deliberating. Specifically, he contends that the evidence did not support such a charge and that because he had no notice of the instruction, he was not afforded an opportunity to address the charge at trial. Thus, Mr. Stoutamire argues the jury instruction was prejudicial. We find this argument to be without merit. *Page 18 
 {¶ 67} "The decision to issue a particular jury instruction rests within the sound discretion of the trial court." State v. Nichols, 11th Dist. No. 2005-L-017, 2006-Ohio-2934, ¶ 28, citing State v.Huckabee (Mar. 9, 2001), 11th Dist. No. 99-G-2252, 2001-Ohio App. LEXIS 1122, 18. "Absent an abuse of discretion this court will not reverse the trial court's decision to provide the jury with a specific instruction." Id. "The term `abuse of discretion' connotes more than error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Id., citing State v. Adams (1980),62 Ohio St.2d 151, 157.
 {¶ 68} Mr. Stoutamire argues that the evidence does not support a charge of complicity. "A court's jury instructions should contain plain, unambiguous statements of the law, which are applicable to the case and evidence presented to the jury." Id. at ¶ 30, citing State v. Sims, 11th Dist. No. 2001-L-081, 2003-Ohio-324, ¶ 60. "The jury instructions provided by the trial court must be confined to the issues raised by the pleadings and the evidence.'" Id., quoting State v. Kirin (Aug. 11, 2000), 11th Dist. No. 99-T-0054, 2000 Ohio App. LEXIS 3661. "Accordingly, the trial court may not instruct a jury where is no evidence to support the issue addressed by the instruction." Id., citingSims at ¶ 60; Kirin.
 {¶ 69} Pursuant to R.C. 2923.03(F): "[w]hoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense."
 {¶ 70} The evidence presented at trial revealed that at least two individuals participated in the shooting of Mr. Peterman. Several of the neighbors, Ms. Allen and *Page 19 
Ms. Bumbico testified that they observed two individuals running in separate directions. Detective Mackey testified that he noticed two sets of footprints, each going around the A building, one to the left, the other to the right. Detective Merritt also testified that he observed footprints, but that before they could be photographed they were erased by the heavily falling snow.
 {¶ 71} It is important to note that it is not essential to prove whether Mr. Stoutamire was aiding and abetting or acting as the principal to be convicted of complicity since "per R.C. 2923.03(A), a defendant can engage in complicity while acting as the principal offender." Id. at ¶ 38, citing State v. Read (Dec. 10, 1999), 11th Dist. No. 98-L-127, 1999 Ohio App. LEXIS 5932, 7.
 {¶ 72} The evidence presented at trial circumstantially linked Mr. Stoutamire to the robbery shooting. Albeit no .40 caliber weapon was ever found or linked directly to him, the jury had before it evidence of a bag of five unspent .40 caliber bullets that Ms. Gordon handed to the police following the incident of February 19; and they heard testimony that at least two individuals participated in the shooting. Thus, the jury understandably queried: "Can the defendant be found guilty of aggravated burglary without handling the gun?"
 {¶ 73} In response, the court gave an instruction on complicity and cautioned that "* * * the mere association with one who perpetuates an unlawful act does not render a person a participant in the crime so long as his acts are innocent. * * * The mere presence of the defendant at the scene of the crime is not sufficient to prove, in and of itself, that the defendant was an aider or abettor." *Page 20 
 {¶ 74} As we stated in a similar case, State v. Morgan (Sept. 30, 1991), 11th Dist. No. 90-A-1554, 1991 Ohio App. LEXIS 4608: "we see no debate to the general principle [sic], that a trial judge may give additional instructions after the jury has begun deliberating." Id. at 6, citing Liska v. State (1926), 115 Ohio St. 283.
 {¶ 75} "In determining the question of prejudicial error in instructions to the jury, the charge must be taken as a whole, and the portion that is claimed to be erroneous or incomplete must be considered in its relation to, and as it affects and is affected by the other parts of the charge. If from the entire charge it appears that a correct statement of the law was given in such a manner that the jury could not have been misled, no prejudicial error results." Id., citing State v.Hardy (1971), 28 Ohio St.2d 89, 92.
 {¶ 76} As in Morgan, the supplemental instruction "was clearly in response to an earlier request for clarification of the law." Id. at 7. Moreover, it was not misleading; it was supported by the evidence, and could have been given during the original jury instruction. Thus, the trial court properly instructed the jury and did not abuse its discretion in doing so during deliberations in response to a jury question.
 {¶ 77} Thus, Mr. Stoutamire's second assignment of error is without merit.
 {¶ 78} Unlawful Restraint and the Lesser Included Offense ofAbduction
 {¶ 79} In his third assignment of error, Mr. Stoutamire contends that the trial court abused its discretion by overruling his request to instruct the jury on a lesser included offense of abduction, unlawful restraint. Specifically, Mr. Stoutamire argues that evidence was presented that there was no force or threat of force in his dispute with Ms. Gordon. He argues, therefore, that an instruction of unlawful restraint was relevant and necessary for the jury to evaluate the evidence. We disagree with this contention. *Page 21 
 {¶ 80} "When a criminal defendant requests that a lesser included offense instruction be given, the trial court must make two determinations. First, the court must decide what constitutes a lesser included offense of the charged crime. Second, the trial court must consider the facts of a given case and ascertain whether the jury could reasonably conclude that the presented evidence would support a conviction for the lesser offense, but not the greater." State v.Jaryga (Dec. 28, 2001), 11th Dist. No. 99-L-179, 2001 Ohio App. LEXIS 6002, 26-27, citing State v. Kutnar (Sept. 30, 1999), 11th Dist. No. 98-L-117, 32 Ohio St.3d 279, 280.
 {¶ 81} "There is no question that unlawful restraint is a lesser [included offense of] abduction." Id. at 7, citing Kutnar at 13;State v. Bleasdale (Sept. 6, 1996), 11th Dist. No. 95-A-0047, 1996 Ohio App. LEXIS 3876, 11. However, "a criminal defendant is entitled to such an instruction only if warranted by the evidence. Stated differently, a lesser included offense instruction will be given where the trier of fact could reasonably find for the accused on one or more elements of the crime charged, and against the accused on the remaining elements, which form the lesser included offense." Id., citing Kutnar at 10. "Thus, a trial court should give an instruction on a lesser included offense only when the evidence presented is such that a jury could both reasonably acquit the defendant of the charged offense and convict him of the lesser included offense." Id., citing Kutnar at 11.
 {¶ 82} Mr. Stoutamire argues that because Ms. Gordon testified she wanted to be with him, but that because he had a gun, she did not go with him, this is evidence that he did not use force or a threat of force. We disagree with this argument for if the use of a gun cannot be seen as a "threat of force" we are puzzled by what would be. *Page 22 
There is no question that the officers collected a loaded .38 caliber gun from Mr. Stoutamire's car. Ms. Rice, a neighbor, also testified that she saw the gun, and Ms. Gordon testified that Mr. Stoutam ire ordered her, saying: "Get in the car. You want to get shot?"
 {¶ 83} There is also no question that Ms. Gordon was in fear and that Mr. Stoutam ire had punched her. Another neighbor, Ms. Walton, testified that she heard a girl screaming, and that when she looked out her window, she observed the girl run to the police and throw herself on one of the patrol vehicles, yelling for help. Officer Miller saw Ms. Gordon jump out of Mr. Stoutamire's car and run to the officers, telling them that Mr. Stoutamire had a gun and that he had tried to kill her. Officer Miller testified that she appeared "all beat up," with a bloody lip, red face and marks, as well as a torn shirt sleeve. Indeed, Mr. Stoutamire initially pulled her out of Red's house by her coat, ripping it as he did so. Thus, there is no question that the evidence reflected not just a threat of force, but force itself.
 {¶ 84} As we stated in a similar case, State v. Bleasdale, supra: "In this case, appellant believes that the evidence failed to prove that he caused physical harm to [the victim] and therefore, an instruction on unlawful restraint should have been given. However, the state's evidence clearly supported the charge of abduction. Based on the evidence presented it would have been unreasonable for the jury to conclude that [the victim] was not in fear or risk of physical harm while being held at gun point * * *." Id. at 11-12, citing State v. Kilby (1997),50 Ohio St.2d 21.
 {¶ 85} The evidence does not support an instruction on unlawful restraint and the trial court did not abuse its discretion in refusing to give such an instruction. *Page 23 
 {¶ 86} Mr. Stoutamire's third assignment of error is without merit.
 {¶ 87} Manifest Weight of the Evidence
 {¶ 88} In his fourth assignment of error, Mr. Stoutamire contends that his conviction is against the manifest weight of the evidence and that the jury's verdict was inconsistent with the evidence and testimony presented at trial. Specifically, Mr. Stoutam ire argues that there was no physical evidence that connected him to the shooting of Mr. Peterman. Because his alibi witness, Ms. Talbert, testified that he was home until approximately 11:30 p.m., he contends there was simply no way he could have shot Mr. Peterman at 11:00 p.m. Thus, Mr. Stoutamire argues the evidence does not support his conviction and should be reversed. We find this contention to be without merit.
 {¶ 89} "Manifest weight of the evidence raises a factual issue and involves `the inclination of the greater amount of credible evidence.'"State v. Homan, 11th Dist. No. 2006-P-0116, 2007-Ohio-6162, ¶ 10, citingState v. Grayson, 11th Dist. No. 2006-L-153, 2007-Ohio-1772, ¶ 30, citing State v. Thompkins, 78 Ohio St.3d 380, 387. "Although the weight to be given to the evidence and the credibility of the witnesses is primarily for the trier of fact to determine, State v. Thomas (1982),70 Ohio St.2d 79, at syllabus, when reviewing a manifest weight challenge, the appellate court sits as the `thirteenth juror.'" Id., citingThompkins at 387.
 {¶ 90} "As such, the reviewing court must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, `in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed * * *.'" Id. at ¶ 11, *Page 24 
citing Grayson at ¶ 30, citing Thompkins at 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 91} "The reviewing court may exercise its discretionary power to reverse a judgment as being against the manifest weight of the evidence only in `those extraordinary cases where, on the evidence and theories presented, and taken in a light most favorable to the prosecution, no reasonable [trier of fact] could have found the defendant guilty." Id. at ¶ 12, citing Grayson, citing Thompkins at 387, citing State v.Bradford (Nov. 7, 1998), 5th Dist. No. CA-7522, 1988 Ohio App. LEXIS 4576, 4.
 {¶ 92} Mr. Stoutamire argues that because no physical evidence directly links him to the shooting of Mr. Peterman and that because he presented an alibi witness, the weight of the evidence does not support his conviction for aggravated robbery. A review of the evidence, however, reveals that the evidence weighs heavily in a finding of guilt and that the jury did not so lose its way.
 {¶ 93} Mr. Stoutamire's alibi was less than indisputable. When asked what time Mr. Stoutamire left his mother's house, Ms. Talbert testified that on the night of January 9, "[Mr. Stoutamire] yelled upstairs to me like, I don't know what time. It had to be between like I'd say 11:30. I mean I wasn't watchin' the clock. I didn't have reason to. And I know my girl called me like maybe 15 minute after he yelled up and was like, Tara, it's almost midnight. Are you comin?'"
 {¶ 94} While it is true that there was no direct evidence linking Mr. Stoutamire to the shooting, the circumstantial evidence weighs heavily in support of a guilty verdict. Specifically, Mr. Brady's cousin, "Skee," testified that Mr. Brady and Mr. Stoutamire came knocking on his door "like 20 dogs were chasing them." They were acting *Page 25 
paranoid and Mr. Stoutamire told the pair as they changed out of their clothes, depositing them in a plastic bag, that he got into a confrontation and that he "hit the dude twice," while indicating the precise location of Mr. Peterman's gunshot wounds. Skee also observed spots of blood on Mr. Stoutamire's jeans. Ms. Gordon testified that she had to leave the tattoo artist to pick up Mr. Brady and Mr. Stoutamire, who called asking for a ride. She observed the plastic bag and after dropping Mr. Brady off by Trumbull Memorial Hospital, Mr. Stoutamire admitted to her that they were supposed to rob someone, that someone got shot, and that the robbery was fruitless. Ms. Gordon also observed the spots of blood on Mr. Stoutamire's jeans. Mr. Brown, who knew all the actors, testified that Mr. Peterman's name was mentioned the day before the robbery/shooting as a potential target.
 {¶ 95} Thus, whether the jury chose to believe Mr. Stoutamire's alibi witness, or the overwhelming evidence the state presented, there is nothing to suggest the jury lost its way or that such a manifest miscarriage of justice occurred that a new trial is warranted.
 {¶ 96} "It is well-settled that when assessing the credibility of witnesses, `the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact."State v. Armstrong, 11th Dist. No. 2007-G-2756, 2007-Ohio-6405, ¶ 29, citing State v. McKinney, Jr., 11th Dist. No. 2006-L-169,2007-Ohio-3389, ¶ 49, citing Grayson at ¶ 31, citing State v. Awan
(1986), 22 Ohio St.3d 120, 123.
 {¶ 97} Mr. Stoutamire's fourth assignment of error is without merit.
 {¶ 98} Cumulative Error *Page 26 
 {¶ 99} In his fifth assignment of error Mr. Stoutamire argues that he was denied his right to a fair trial as a result of the cumulative errors that occurred throughout the trial. The errors Mr. Stoutamire cites are the assignments of error that he has just raised, which we have found to be wholly without merit. Thus, we find this argument to be without merit.
 {¶ 100} "There can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." State v.Baksi (Dec. 23, 1999), 11th Dist. No. 98-T-0123, 1999 Ohio App. LEXIS 6271, 26, citing United States v. Hasting (1983), 461 U.S. 499, 508-509. "However, the Constitution does guarantee that a criminal defendant receive a fair trial." Id., citing Delaware v. Van Arsdall (1986),475 U.S. 673, 681. "As a result, `a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." Id., quoting State v. Garner (1995), 74 Ohio St.3d 49.
 {¶ 101} The difficulty with Mr. Stoutamire's argument is that he has not demonstrated that the trial court committed errors, either harmless or prejudicial, warranting the invocation of the doctrine of cumulative error. State v. Theisler, 11th Dist. No. 2005-T-0106, 2007-Ohio-213, ¶ 123.
 {¶ 102} "The doctrine [of cumulative error] is not applicable to the case at bar as we do not find multiple instances of harmless error." Id. at ¶ 124, citing Garner at 64. Thus, "[w]here an appellant has not made a persuasive showing of cumulative error, his argument is not meritorious." Id. at ¶ 125, citing State v. Sanders (2001),92 Ohio St.3d 245, 279. *Page 27 
 {¶ 103} Mr. Stoutamire's fifth assignment of error is without merit.
 {¶ 104} The judgment of the Trumbull County Court of Common Pleas is affirmed.
DIANE V. GRENDELL, P.J., concurs,
COLLEEN MARY OTOOLE, J., dissents with a Dissenting Opinion.