OPINION
{¶ 1} Defendant-appellant, Rodney Carson ("appellant"), appeals from a judgment of the Franklin County Court of Common Pleas convicting him of one count of aggravated murder with specification in violation of R.C. 2903.01, an unclassified felony, and one count of having a weapon while under disability in violation of R.C. 2923.13, a felony of the fifth degree.
 {¶ 2} The charges in this case arose out of the shooting death of Eric Rawlings ("Rawlings") that occurred on March 14, 2003, in front of the CS Lounge on East Fifth Avenue in Columbus, Ohio. The autopsy revealed that Rawlings received two gunshot wounds, one to the back of the head, which caused Rawlings' death, and one to the palm of the right hand.
 {¶ 3} On March 14, 2003, Henry Harris ("Harris") stopped at the CS Lounge to get some take-out food. He saw appellant there, and as he was walking home, at approximately 5:30 p.m., Harris saw appellant riding a yellow bike.
 {¶ 4} William Bentley ("Bentley"), the only witness to the shooting, testified that he had gone out to pick up some dinner and was walking back home when he saw two men arguing. According to Bentley, one man, later identified as Rawlings, was being held by his coat. The man holding Rawlings had a gun in his waistband. Bentley was approaching the men, and when he was approximately 40 feet away, he saw the gun-man pull out the gun and he heard Rawlings yell, "[D]on't shoot me." (Tr. Vol. 4, at 127.) Bentley saw the gunman hold Rawlings with one hand, and with the other hand, the gunman put the gun to Rawlings' head and fired once. The gunman then fired three or four more shots in succession. Bentley watched the gunman get on a yellow bike and ride down the street to a pay phone where the gunman was yelling for someone to come and get him. Bentley went into his house, obtained his cell phone, and called 911. Bentley returned to the street and saw that the gunman was still on the pay phone. Bentley described the gunman as wearing jeans, a mid-length down-filled coat that was "puffy." (Id., at 129.) Bentley then saw a van pull up to the body, and three young men got out of the van, and searched Rawlings' pockets. One of the men took Rawlings' wallet, but Bentley did not see what he did with it. After about 15-30 seconds, the men got back into the van and sped away.
 {¶ 5} Dan Merce ("Merce") was walking his dog near the scene when he heard two men yelling and saw them pushing each other. Merce saw that one of the men had a gun and so Merce crossed the street to avoid them. Merce heard gunshots and ran down the street. When the gunshots ceased, Merce turned around to see one man lying on the ground, and the other man riding away on a yellow bike. Merce described the gunman as wearing a dark colored "puffy" jacket. (Tr. Vol. 6, at 136.) Merce also witnessed the van pulling up to the body, and the men from the van searching Rawlings' pockets.
 {¶ 6} Numerous calls were made to 911. Bentley's call was logged at 8:31 p.m. Officer Cummings was the first to arrive at the scene, which was approximately two minutes after the dispatcher aired the report. Officer Cummings secured the scene, and the police log indicates that Rawlings was taken to the hospital via ambulance at 8:44 p.m., and homicide detectives were requested at 8:46 p.m.
 {¶ 7} Christopher McCoy and his cousin, Mike Baber, were at Baber's residence, which is across the street from the pay phone, near the scene of the shooting. They went outside as police responded to the scene and saw an African-American male at the pay phone yelling and screaming. McCoy testified that he heard the man saying, "[C]ome fucking get me out of here. I did what I had to do." (Tr. Vol. 5, at 98.) McCoy recalled the man at the pay phone wearing jeans, a black do-rag, and a mid-length black leather jacket, and he did not recall any writing or any kind of lettering on the jacket. Baber also testified that he heard the man at the pay phone asking someone to come and get him out of there, and the man said, "I did what I had to do." (Id., at 171.) Baber described the man on the pay phone as wearing a medium length leather coat that was plain. Baber also testified that the man on the pay phone got on a yellow bike and rode away.
 {¶ 8} Telephone records confirmed that an outgoing call was placed from the pay phone near the scene to a toll free number registered to Carolyn Clark ("Clark"). The call was placed at 8:36 p.m., and lasted approximately seven minutes. Clark testified that at that time she lived with appellant's father, Richard Carson, and that the toll free number was given to Richard Carson's children.
 {¶ 9} In the months following the shooting, the police interviewed witnesses, appellant, and other suspects. On November 18, 2003, appellant was indicted by a Franklin County Grand Jury on one count of aggravated murder with two firearm specifications and one count of having a weapon under disability ("WUD"). Appellant pleaded not guilty to all of the charges and the case proceeded to jury trial. The jury found appellant guilty of aggravated murder including the two firearm specifications. The WUD charge was tried to the bench. Appellant stipulated to his prior conviction and the trial judge found appellant guilty of the WUD charge. After denying appellant's motion for a new trial, the trial court sentenced appellant to twenty years to life for the aggravated murder conviction and a mandatory consecutive three-year term for the gun specification. Appellant timely appealed.
 {¶ 10} On appeal, appellant asserts the following six assignments of error:
ASSIGNMENT OF ERROR I
The trial court erred when it entered judgment against Appellant when the evidence was insufficient to sustain a conviction and was not supported by the manifest weight of the evidence.
ASSIGNMENT OF ERROR II
The trial court commits reversible error when it fails to grant a mistrial when trial spectators intimidate the jury and the jury believes those spectators are in some way connected to Appellant in violation of his right to a fair trial under the state and federal constitutions.
ASSIGNMENT OF ERROR III
The trial court commits reversible error when it fails to instruct the jury that they need not reach a unanimous decision regarding Appellant's guilt on the principal charge, before considering the lesser included offense.
ASSIGNMENT OF ERROR IV
Appellant's due process rights under the state and federal constitutions were violated when he was subjected to an in custody interrogation without being properly advised of his Miranda rights, and after he invoked his right to counsel.
ASSIGNMENT OF ERROR V
To the extent that the errors in Assignment of Error 3 and 4 are not cognizable under the plain error rule, Appellant was denied his right to effective assistance of counsel under the state and federal constitutions.
ASSIGNMENT OF ERROR VI
Appellant's right to due process under the state and federal constitutions was violated by prosecutorial misconduct when the state tried to shift the burden of proof to Appellant and solicited inadmissible testimony.
 {¶ 11} By his first assignment of error, defendant contends that the evidence was insufficient to sustain a conviction and that his conviction was not supported by the manifest weight of the evidence.
 {¶ 12} The Ohio Supreme Court described the role of an appellate court presented with a sufficiency of the evidence argument in State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus:
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781, followed.)
 {¶ 13} Whether the evidence is legally sufficient is a question of law, not fact. State v. Thompkins (1997),78 Ohio St.3d 380, 386. In determining the sufficiency of the evidence, an appellate court must give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v. Virginia (1979),443 U.S. 307, 319, 99 S.Ct. 2781. Consequently, the weight of the evidence and the credibility of the witnesses are issues primarily determined by the trier of fact. State v. Yarbrough,95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 79; State v. Thomas
(1982), 70 Ohio St.2d 79, 80. Thus, a jury verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. State v. Treesh (2001), 90 Ohio St.3d 460, 484; Jenks,
supra.
 {¶ 14} A manifest weight argument is evaluated under a different standard. "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other."State v. Brindley, Franklin App. No. 01AP-926, 2002-Ohio-2425, at ¶ 35, citation omitted. In order for a court of appeals to reverse the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court must disagree with the fact finder's resolution of the conflicting testimony. Thompkins, supra, at 387. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id., quotingState v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 15} A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial. State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. The determination of weight and credibility of the evidence is for the trier of fact. State v.DeHass (1967), 10 Ohio St.2d 230. The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.State v. Williams, Franklin App. No. 02AP-35, 2002-Ohio-4503, at ¶ 58; State v. Clarke (Sept. 25, 2001), Franklin App. No. 01AP-194. The trier of fact is free to believe or disbelieve all or any of the testimony. State v. Jackson (Mar. 19, 2002), Franklin App. No. 01AP-973; State v. Sheppard (Oct. 12, 2001), Hamilton App. No. C-000553. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the fact finder's determination of the witnesses' credibility. State v. Covington, Franklin App. No. 02AP-245, 2002-Ohio-7037, at ¶ 22; State v. Hairston, Franklin App. No. 01AP-1393, 2002-Ohio-4491, at ¶ 17.
 {¶ 16} With respect to his sufficiency claim, appellant advances two arguments. First, appellant contends that there is insufficient evidence to sustain his conviction because no one identified appellant as the shooter, there is no physical evidence linking appellant to the shooting, and the evidence points strongly to another suspect, specifically Rashawn Garner ("Garner"). Thus, under this argument, appellant argues that his conviction should be vacated in its entirety. Second, appellant argues in the alternative that the facts do not support an a