[Cite as *State v. Lowery*, 2020-Ohio-5549.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                            Court of Appeals No. L-18-1170

      Appellee                                      Trial Court No. CR0201702559

v.

Mark Alan Lowery                                **DECISION AND JUDGMENT**

      Appellant                                     Decided:  December 4, 2020

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**SINGER, J.**

{¶ 1} Appellant, Mark Lowery, appeals the July 23, 2018 judgment of the Lucas County Court of Common Pleas which sentenced appellant to serve two consecutive terms of life without the possibility of parole.  For the following reasons, we affirm.

## Facts and Procedural Background

*Facts Relating to Victim A.D.*

{¶ 2} On July 5, 2015, A.D. left for his annual Las Vegas trip where he would gamble and buy collectible coins. It was well known that A.D. took this trip near the Fourth of July every year. On July 8, 2015, he was set to return, but his flight was delayed until early on next day. After he arrived, A.D. planned to pick up his mail and have lunch with a friend. A.D. did not pick up his mail or go to lunch with his friend. A.D. was very routine oriented and had lunch at the same time every day with the same person and rarely missed a lunch. On July 10, A.D. once again missed his daily lunch with his friend. Worried because A.D. missed two lunches, the friend contacted A.D.'s niece and the two checked on A.D.'s trailer.

{¶ 3} When they arrived at A.D.'s trailer, A.D.'s jeep was not at the trailer. Inside the trailer, they found A.D. dead in the doorway of his bathroom. A.D. had been struck in the head with the stock of a gun in the bedroom and then was stabbed several times in the entrance to the bathroom. Upon review of the bedroom, police found an empty open suitcase and an open lockbox. There was no blood trail between the bedroom and the bathroom.

{¶ 4} Police also discovered a pill box that was divided by the days of the week, which was empty until Thursday, or the day he arrived back in town. No evidence of forced entry into the trailer was found and no DNA, other than A.D.'s, was found in the

2.

trailer. Several items were discovered missing from the trailer including collectible coins, DVDs, and a gold watch. A.D.'s long guns were also missing.

{¶ 5} The coroner determined that A.D. died either late on July 9 or early on July 10 based on the temperature of the body and other determining factors when the body was discovered. The coroner also noted that A.D. had defensive wounds.

{¶ 6} A.D.'s jeep was subsequently found about three-quarters of a mile away. Police canvased the area and found a neighbor who reported they picked up black winter gloves from the pathway leading to Stacy Groll's house. The neighbor reported finding the gloves because they found it odd that there were winter gloves out in July and the weather was warm. Police gathered the gloves for evidence.

{¶ 7} These gloves were sent to the Bureau of Criminal Investigation (BCI) where they were tested for DNA using a newly adopted testing kit called Globalfiler. BCI changed the testing kit they utilized in these types of investigations because the Globalfiler kits were more sensitive than the previously used testing kit. The original scientist tested the gloves and found no DNA. Because the original scientist was unavailable for trial due to medical leave, another scientist retested the gloves and determined that the DNA from A.D. and appellant was present inside the gloves. Appellant did not object to the introduction of this evidence.

{¶ 8} A neighbor reported seeing two men in the jeep during this period, neither of which matched the description of appellant. Officers would later testify that this neighbor's statements and descriptions were not consistent enough to rely upon. This

3.

neighbor's boyfriend was also interviewed by police. He originally gave the police a false name because he had an outstanding warrant. The man had a contusion on his head and scratches on his arms. He indicated the injuries were obtained the night before where he was working as a bouncer and had to break up a fight. The man's coworkers could not recall the fight, but remembered that they had to drive the man home because he was heavily intoxicated.

{¶ 9} A neighbor had security footage of where the jeep was located, but due to the angle of the camera, the footage did not record the jeep coming or going from the neighborhood. Because there was nothing substantive on the footage, it was not gathered by the police.

{¶ 10} Police also interviewed Stacy Groll who lived near where the jeep was found. The black winter gloves were found on the path between the jeep and her home. She indicated that appellant rode his bike to her home on either July 8 or July 9, although she could not remember specifically which day he arrived at her home. When appellant visited her home, he had several duffle bags which were filled with DVDs, coins, foreign money, savings bonds, and long guns. Groll testified that appellant told her that his friend was out of town and that appellant had robbed his friend while he was gone. She indicated that appellant did not appear different or unusual on July 9 when he visited her house.

{¶ 11} Appellant's mother testified that she was home on the night of July 9, 2015, but left early in the morning on July 10. She indicated her son, who lives with her in the

4.

same trailer park where A.D. resided, did not have any scratches or marks on him when she returned from her trip out of town. She testified that appellant also had hundreds of DVDs in his possession and said that could explain the several duffle bags appellant had at Groll's house.

{¶ 12} Appellant would later tell the police that he was sleeping on the night of July 9, 2015, and that he did not murder A.D. However, appellant took a selfie in his mother's bedroom at 2:25 a.m., which is during the time it is believed that A.D. was murdered and during the time period when appellant claimed he was sleeping.

{¶ 13} After A.D.'s funeral, his family began to clean out his trailer. The trailer was locked one night after one of the cleaning sessions. When a family member returned the next day, they found the door unlocked and items, including additional DVDs, had been moved. No fingerprints were found in the trailer after this incident. The key to the trailer was attached to the key to the jeep and was never recovered.

{¶ 14} While appellant was incarcerated, he spoke with his mother on the phone. He asked her to grab some personal items from a wooded area near the trailer park. Police obtained the audio of the phone call and searched the wooded area. In this wooded area, police found appellant's items he asked his mother to gather for him as well as A.D.'s social security card, medicare prescription card, driver's license, savings bonds in A.D.'s name, and the coin protectors A.D. used for the collectible coins he obtained from Las Vegas. A.D.'s property was scattered over 150 yards of the wooded area.

5.

*Facts Relating to Victim T.M.*

{¶ 15} On November 9, 2015, a detective was driving at 7:00 a.m. when the detective saw a set of apartments that were ablaze. T.M. lived in one of the apartments. He was found dead in the apartment after the fire was extinguished. A backpack with drugs in it was found near the body. When his body was recovered, it was determined that he suffered from 13 blunt force injuries with a curved object, like a hammer, and five stab wounds to his abdomen. T.M. died prior to the start of the fire because no smoke was found in his lungs. The clocks in the apartment were stopped at 6:30 a.m. either by melting or the heat caused the objects to malfunction, indicating when the fire started.

{¶ 16} A fire investigator testified that he believed the fire began in the kitchen near T.M.'s body. No accelerants were found and there was no electricity to the apartment so no known cause of the fire was stated. Despite a lack of stated cause to the fire, the fire investigator concluded that the fire was started by human hand and was intentionally started.

{¶ 17} T.M. was a known drug dealer. It was also known that T.M. generally kept his wares in a drawer in the kitchen, not in the backpack they were later found in. Groll was a client of T.M. and on the night that he passed away, she purchased drugs from him at 11:00 p.m. the night before and at 3:00 a.m. the morning he died. When she arrived at 3:00 a.m., Groll testified that she saw appellant completing lighting work on the apartment. The apartment did not have electricity the night the fire was set because appellant turned off the power so that he could safely work on the lighting fixture.

6.

Appellant would later testify that he was completing this handy work in return for drugs. A neighbor testified that he yelled at T.M. for turning off the power early in the morning on the day T.M. died.

{¶ 18} Around 7:00 a.m., Groll became aware that there was a fire at T.M.'s apartment and immediately went to the site. She then called appellant to inform him of the fire. When appellant answered, he originally pretended to be his brother. Eventually, appellant came clean and asked Groll not to say anything to the police about him being at the apartment because he was still under investigation for the murder of A.D. On the phone, appellant stated that he left shortly after Groll left early in the morning, but when he was leaving he saw three men in a black car pull up. Appellant stated that T.M. yelled at the men that they were not welcome at his home.

{¶ 19} Groll stated that when she saw appellant shortly after this conversation, appellant did not appear unusual or have any marks on him. T.M.'s phone would later be found in the same wooded area within ten feet of where A.D.'s property was discovered. Appellant would later testify that T.M. moved his drugs because Groll was known to stand people up. He also testified that Groll testified against him because she was upset that he had stayed the night with another woman.

### Assignments of Error

{¶ 20} Appellant brings forth seven assignments of error for our review:

Assignment of Error One: The trial court erred to [appellant's] prejudice by refusing to sever the trials for the two incidents involving two victims.

Assignment of Error Two: [Appellant's] Fifth Amendment rights pursuant to *Miranda* were violated when a detective failed to stop the interrogation after [appellant] requested a lawyer.

Assignment of Error Three: The trial court committed plain error by admitting the BCI technician's report from May 2018, as it was not scientifically reliable pursuant to Evid.R. 702 and *Daubert*.

Assignment of Error Four: Defense counsel rendered ineffective assistance by failing to object to admission of the BCI technician's report from May 2018, as it was not scientifically reliable pursuant to Evid.R. 702 and *Daubert*.

Assignment of Error Five: [Appellant] was denied Due Process of law because his conviction are unsupported by sufficient evidence, and are also against the manifest weight of the evidence.

Assignment of Error Six: The conviction for aggravated robbery and aggravated burglary, both for the theft offenses relating to [A.D.], should have merged at sentencing.

Assignment of Error Seven: The convictions for aggravated robbery and murder relating to [A.D.], and the convictions for aggravated robbery and murder as to [T.M.], should have merged at sentencing.

## 1. The trial court did not commit error by refusing to sever the trials of the two victims.

{¶ 21} In his first assignment of error, appellant argues that because the two victims were unrelated, the charges relating to each victim should not have been included in just one trial.

{¶ 22} Crim.R. 8(A) provides:

> Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

{¶ 23} "Joinder is liberally permitted to conserve judicial resources, reduce the change of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992), citing *State v. Torres*, 66 Ohio St.2d 340, 343, 412 N.E.2d 1288 (1981).

{¶ 24} Even if offenses are properly joined under Crim.R. 8(A), a defendant can still move to sever the charges under Crim.R. 14 if the consolidation of the offenses will prejudice his or her rights. *Id*. "'If a motion to sever is made at the outset of a trial, it must be renewed at the close of the state's case or at the conclusion of all of the evidence so that a Crim.R. 14 analysis may be conducted in light of all the evidence presented at

9.

trial.'" *State v. Stuckman*, 6th Dist. Sandusky Nos. S-17-039, S-17-040, 2018-Ohio-4050, ¶ 37, quoting *State v. Rojas*, 6th Dist. Lucas No. L-11-1276, 2013-Ohio-1835, ¶ 34.

> To prevail on his claim that the trial court erred in denying his motion to sever, the defendant has the burden of demonstrating three facts. He must affirmatively demonstrate (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial. *Schaim* at 59, citing *Torres* at syllabus.

{¶ 25} To determine whether a defendant was prejudiced by the joinder of multiple offenses, a court must first determine "(1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." *Id*., citing *State v. Hamblin*, 37 Ohio St.3d 153, 158-159, 524 N.E.2d 476 (1988). "If the evidence of other crimes would be admissible at separate trials, any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." *Id*., quoting *Drew v. United States*, 331 F.2d 85, 90 (C.A.D.C.1964).

{¶ 26} In response to the defendant's claim of prejudice, the state may utilize one of two tests: the "other acts" test or the more lenient "joinder" test. *Stuckman* at ¶ 39,

10.

citing *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990). Under the "other acts" test, the state must demonstrate that evidence of the other charges would be admissible under Evid.R. 404(B) even if the counts were severed for trial. *Id.*, citing *State v. Gibson*, 6th Dist. Lucas Nos. L-13-1222 and L-13-1223, 2015-Ohio-1679, ¶ 28. Under the "joinder" test, the state may defeat the defendant's claims of prejudice by showing that the jury is capable of separating the proof of each charge because the evidence for each charge is simple and direct. *Id.* "'Ohio appellate courts routinely find no prejudicial joinder presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof.'" *Id.*, quoting *State v. Lewis*, 6th Dist. Lucas No. L-09-1224, 2010-Ohio-4202, ¶ 33.

{¶ 27} Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 28} A trial court must determine first that "other acts" evidence is relevant to the particular purpose for which it was offered. *State v. Hartman*, Slip Opinion No. 2020-Ohio-4440, ¶ 26, citing *State v. Curry*, 43 Ohio St.2d 66, 73, 330 N.E.2d 720 (1975). Courts also must determine that "[t]he nonpropensity purpose for which the evidence is offered must go to a 'material' issue that is actually in dispute between the parties." *Id.* at ¶ 27, citing *Huddleston v. United States*, 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed.2d

11.

771 (1988). Next, the trial court must determine that the probative value outweighs the prejudicial value. *Id*. at ¶ 29, citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20. "If the fact that the proponent seeks to prove by way of other acts is not genuinely disputed or material to the case, then it has little probative value and the risk of prejudice is high." *Id*. at ¶ 31.

> 'Modus operandi' literally means method of working. It is evidence of signature, fingerprint-like characteristics unique enough 'to show that the crimes were committed by the same person. Evidence of modus operandi is relevant to prove identity: 'Evidence that the defendant has committed uncharged crimes with the same peculiar modus tends to identify the defendant as the perpetrator of the charged crime. To be admissible, both the other-acts evidence and the charged crime must involve 'the same distinctive, one-of-a-kind modus.' (Citations omitted). *Id*. at ¶ 37.

{¶ 29} The determination of whether to try two cases separately or jointly is within the discretion of the trial court. *State v. Bradley*, 6th Dist. Erie No. E-13-013, 2015-Ohio-395, ¶ 9, citing *State v. Thompson*, 127 Ohio App.3d 511, 523, 713 N.E.2d 456 (8th Dist.1998). An abuse of discretion occurs where the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 219, 450 N.E.2d 1140 (1983).

{¶ 30} Appellant argues joinder was improper in this matter because there was frequent attention switching between the two murders. Appellant argues that attention

12.

switching occurred because two of the most important witnesses, Groll and Detective Hahn testified to both of the murders while on the stand. Appellant also argues that the charged offenses were not of the same character because the crimes were not connected and were not proven at trial to be a part of a scheme or course of conduct. Appellant also argues that he suffered prejudice from the joinder of the trials and that appellee cannot meet the burden of the "other acts" test.

{¶ 31} In response, appellee argues that evidence of each crime would have been admissible under Evid.R. 404(B) because the evidence demonstrated a modus operandi was similar between the two crimes. Appellee also argues that the evidence of the two crimes was simple and direct because the crimes were separated by times, places, and victims. Appellee argues that there was a chronological organization to the crimes which assisted in segregating the evidence related to each of the victims.

{¶ 32} On February 6, 2018, appellant filed a motion to sever the counts relating to each victim. Appellant argued that the motion to sever should be granted because presenting evidence relating to one victim with the evidence of the other victim would be prejudicial and appellant may be denied his constitutional right to testify for strategic reasons.

{¶ 33} Appellee responded to this motion by arguing that joinder of the charges was proper because the two crimes demonstrated a common modus operandi, including the area where the crimes took place, appellant was in close proximity to both victims, the victims were killed in a similar manner, and the victims' property was found in the same

13.

area with appellant's own property. Appellee also argued that appellant failed to meet his burden in demonstrating that severance was proper.

{¶ 34} In response, appellant argued that the limited facts appellee puts forth to demonstrate a modus operandi would also lead to appellant being charged with similar murders which took place at a similar place, time, and in similar manner. He also argued that because there is no evidence linking appellant to the murder of T.M., the jury would use the total accumulation of evidence to convict appellant of both set of charges.

{¶ 35} Following the hearing, the trial court took the motion to sever and the arguments of parties under advisement. On May 30, 2018, the trial court issued a decision overruling appellant's motion to sever because the evidence of the other crime would be admissible in the other because the evidence demonstrates a modus operandi. The trial court also determined that the evidence is relevant to prove the other and the danger of unfair prejudice does not substantially outweigh the probative value of the evidence.

{¶ 36} The trial court determined that there were seven items that were demonstrated commonality between the crimes: (1) both victims were killed in their homes; (2) the murders were in the same one mile area; (3) the victims were killed at night; (4) the crimes were committed within five months of one another; (5) these crimes were the only alleged murders that occurred in that neighborhood during the relevant time frame; (6) the victims were killed in a similar manner; and (7) both victims had property taken from them that was later found by police at the same time and location, the same location which appellant admitted to having some hidden property.

14.

{¶ 37} Appellee sought introduction of the other acts evidence because it was relevant to prove the identity of the perpetrator of both crimes. The identity of the perpetrator was at genuine issue between the parties and was material to the case.

{¶ 38} Some of the facts relied upon by the appellee and found by the trial court were barely indications of a behavioral fingerprint. However, the cause of the murders, i.e., blunt force trauma to the head followed by the stabbing and the theft of the property belonging to the victims and which were found in the same wooded area where appellant had hidden his own personal property, are common modus operandi of the offenses sufficiently relevant to prove identity. We cannot find that the trial court abused its discretion in finding that the seven listed details of the crime formed a modus operandi that helped identify appellant as the perpetrator of the crimes.

{¶ 39} In any event, regardless of the admissibility of evidence of the other crimes under Evid.R. 404(B), the joinder test is met in this case. Only two witnesses overlapped between the charges, Stacy Groll and Detective Hahn. All other evidence is very different for each crime. The two murders took place at different locations and several months apart.

{¶ 40} "'The joinder test requires that the evidence of the joined offenses be simple and direct, so that a jury is capable of segregating the proof required for each offense. The rule seeks to prevent juries from combining evidence to convict of both crimes, instead of carefully considering the proof offered for each separate offense.'" *State v. Lewis*, 6th Dist. Lucas Nos. L-09-1224, L-09-1225, 2010-Ohio-4202, ¶ 32, quoting *State v. Mills*, 62

15.

Ohio St.3d 357, 362, 582 N.E.2d 972 (1992). No prejudicial joinder will be found when the evidence is presented in an "orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof." *Id.* at ¶ 33.

{¶ 41} The evidence presented by appellee in this matter was presented in an orderly fashion with very little evidence overlapping between the crimes. Appellee began its case with evidence and witnesses which related to the death of A.D. Appellee then presented evidence and witnesses that related to the death of T.M. Due to the nature of the two crimes, there was little overlap in information or evidence.

{¶ 42} Detective Hahn's testimony did overlap between the crimes. However, she testified about the entirety of the investigation in a chronological order. Despite this, Detective Hahn's testimony was orderly and chronological which promotes the idea that the evidence is simple and direct. *State v. Stoutamire*, 11th Dist. Trumbull No. 2007-T-0089, 2008-Ohio-2916, ¶ 55.

{¶ 43} Stacy Groll also testified to both crimes as well. Once again, her testimony was in an orderly chronological fashion, first dealing with the day appellant came to her house with the allegedly stolen materials through to the night that she saw appellant following the murder of T.M. There was very little overlap and going back and forth between the two crimes other than when switching between direct examination and cross examination.

{¶ 44} As such, the evidence for the two sets of crimes was simple and direct. A jury would be capable of segregating the proof for both victims. The evidence was

16.

presented in an orderly fashion with limited overlap. Therefore, appellant's first assignment of error is found not well-taken.

### 2. Appellant's Fifth Amendment rights against self-incrimination were not violated during the interrogations by Detective Hahn.

{¶ 45} Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. (Citations omitted). *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

> Under the *Fifth Amendment*, an accused must clearly invoke his
> constitutional right to counsel in order to raise a claim of deprivation of
> counsel. "The suspect must unambiguously request counsel. * * * [H]e
> must articulate his desire to have counsel present sufficiently clearly that a
> reasonable police officer in the circumstances would understand the
> statement to be a request for an attorney. If the statement fails to meet the
> requisite level of clarity, *Edwards* [*v. Arizona*, 451 U.S. 477, 101 S.Ct.

1880, 68 L.Ed.2d 378 (1981)] does not require that the officers stop questioning the subject."

*State v. Carson*, 10th Dist. Franklin No. 05AP-13, 2006-Ohio-2440, ¶ 46, quoting *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

{¶ 46} "Where a suspect speaks freely to police *after* acknowledging that he understands his rights, a court may infer that the suspect implicitly waived his rights." *State v. Murphy*, 91 Ohio St.3d 516, 519, 747 N.E.2d 765 (2001). "'[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney * * * If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.'" *Id*. at 520, quoting *Davis* at 452.

*2016 Interview with Detective Hahn*

{¶ 47} On March 9, 2016, appellant was questioned by Detective Hahn and another detective. At the time of the interrogation, appellant was charged with an unrelated burglary charge. Before Detective Hahn asked appellant questions, she read appellant his *Miranda* rights and appellant began to recite the rights to Detective Hahn. Hahn ensured that although appellant was on medication for his mental health, the medication did not affect appellant's ability to understand his rights or his ability to invoke them. After being read the form with his *Miranda* rights, appellant indicated that he understood his rights. When informed of his right to an attorney, he stated, "Yea I was trying to get ahold of Eric Marks." Appellant demonstrated he was aware of his rights because appellant began

18.

reciting the rights to Detective Hahn and even asked about a difference in phrasing from what he had been read before. He clearly demonstrated his knowledge and understanding of his rights.

{¶ 48} After completing the reading of the form, appellant indicated he would speak to Hahn but that he would only speak to her with an attorney. Hahn explained that the lawyer was not here and if he wished to have an attorney present, they could not speak. Hahn then asked "Do you want to talk to me?" Appellant then began speaking with the detective voluntarily.

{¶ 49} Here, appellant did not request an attorney at the beginning of the interview. Appellant merely stated he attempted to get in contact with an attorney. At the suppression hearing, Hahn testified she was unaware that Eric Marks was even an attorney in town. This matter is similar to the matter in *State v. Carson*, 10th Dist. Franklin No. 05AP-13, 2006-Ohio-2440, where the defendant stated the name of their attorney rather than specifically asking for an attorney to be present during questioning. Appellant's statement about trying to get in touch with Eric Marks was ambiguous as a request for an attorney and was not clear to a reasonable police officer that it was a request for an attorney.

{¶ 50} About nine and one-half minutes into the interview, appellant stated loudly "Look give me my lawyer." He then explained how he had been cooperative with the police and he now wanted to speak to an attorney. He spoke unprompted for about a

19.

minute before Detective Hahn said she can no longer speak to him because he asked for an attorney. Appellant reiterated his need to have an attorney when he spoke to her again.

{¶ 51} Here, appellant unequivocally invoked his right to have an attorney present during questioning. The police did not stop him from speaking for about a minute, but when he was done with his monologue, no further questions were asked of him. Because appellant unambiguously asked for a lawyer, and all questioning ceased after this request, appellant's Fifth Amendment rights were not violated in this interrogation. Therefore, his second assignment of error as it relates to this interrogation is found not well-taken.

*2017 Interview with Detective Hahn*

{¶ 52} On July 17, 2017, appellant was once again questioned by Detective Hahn. Appellant was in custody on the unrelated burglary charge and in a wheelchair. The two began speaking about appellant's health and his family's health. When the two are through speaking about unrelated topics, appellant stated "I can't say anything, lawyer said not to talk." Hahn explained that she did not want to speak about the unrelated burglary charge that appellant already had counsel for. Appellant stated he thinks he is going to wait for his attorney. Hahn stated she should just read him his rights to ensure that they are taken care of. Hahn once again confirmed that she does not want to speak to appellant about the pending burglary charge, but rather other things that have occurred on the east side. Hahn then read the same form with his *Miranda* rights again to appellant. After being read his rights, appellant voluntarily spoke with Detective Hahn.

20.

{¶ 53} At the time of this interrogation by Detective Hahn, appellant was not charged with the murders he was later convicted of. Rather, he was in custody on an unrelated burglary charge. "'[a]n accused's Sixth Amendment right is offense specific. Thus, * * * appointment of counsel with respect to one offense does not bar police questioning as to a second uncharged offense.'" *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 93, quoting *State v. Hill*, 73 Ohio St.3d 433, 446, 653 N.E.2d 271 (1995). Portions of the interview did surround discussions of the crimes against A.D. and appellee agreed to redact the portion of the interview which pertained to these discussions. Both parties stipulated to the removal of these sections of the interview. Appellant's right to counsel was not violated. Therefore, appellant's Sixth Amendment right to have counsel at the questioning was not attached to the uncharged offenses Hahn was asking appellant about during the interrogation.

{¶ 54} Appellant once again did not make an unambiguous assertion that he wanted a lawyer present while being questioned. He indicated that he *thought* he should wait for a lawyer before speaking to Hahn, but once again after being informed of his *Miranda* rights, appellant began speaking openly with Hahn. "[T]he Supreme Court of Ohio has held that "I think I need a lawyer" is not an unequivocal assertion of the right to counsel." *Carson*, 10th Dist. Franklin No. 05AP-13, 2006-Ohio-2440 at ¶ 47, citing *State v. Henness*, 79 Ohio St.3d 53, 62-63, 679 N.E.2d 686 (1997).

{¶ 55} Appellant may have invoked his Sixth Amendment right to an attorney when he made mention of not speaking until his attorney arrived in the burglary case, but

21.

his invocation was not sufficient to invoke his Fifth Amendment rights to counsel for the uncharged murder cases. Therefore, appellant's second assignment of error is not well-taken because he did not unambiguously assert his right to counsel.

### 3. The trial court did not commit plain error by admitting the BCI technician's report because it was scientifically reliable.

{¶ 56} Appellant argues that this retest was not scientifically reliable because the retest did not actually involve a retesting of the material, but rather included a reexamination of the underlying electronic data the original investigator created in her original testing. Appellant also argues that the results using the Globalfiler technology was not scientifically reliable because another court has found this technology did not meet the requirements of *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 59 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and the retest came to different results despite using the same data.

{¶ 57} Appellee in return argues that the expert was properly determined to be an expert in his field, that his testimony was based on reliable scientific information, and the results and analysis were scientifically reliable. Appellee argues that there is no information in the record that would indicate that the results were not scientifically reliable.

{¶ 58} As appellant's trial counsel did not object to the introduction of the DNA evidence at trial, appellant has waived all but plain error. *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 159, citing *State v. Hartman*, 93 Ohio St.3d

22.

274, 286, 754 N.E.2d 1150 (2001). "We have found no plain error when a witness testifies as an expert as long as the witness satisfies the three requirements for testifying as an expert under Evid.R. 702." *Id.* "The Ohio Supreme Court has held that trial courts should 'favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met.'" *State v. Carter*, 8th Dist. Cuyahoga No. 104653, 2017-Ohio-5573, ¶ 28, quoting *State v. Nemeth*, 82 Ohio St.3d 202, 207, 694 N.E.2d 1332 (1998).

{¶ 59} An expert is permitted to testify in terms of possibility rather than in terms of reasonable scientific certainty or probability. *Id.* at ¶ 29, citing *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 129. "The treatment of such testimony involves an issue of sufficiency, not admissibility; they are matters of weight for the jury." *Id.* "Expert testimony regarding DNA evidence is similarly treated * * * 'questions regarding the reliability of DNA evidence in a given case go to the weight of the evidence rather than its admissibility.'" *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 78, quoting *State v. Pierce*, 64 Ohio St.3d 490, 501, 597 N.E.2d 107 (1992).

{¶ 60} Evid.R. 702(C) provides that a witness may testify as an expert if:

The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

23.

(1) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a wat that will yield an accurate result.

{¶ 61} Logan Schepler was the forensic scientist who testified about the DNA results at trial. Schepler was employed with the Ohio Bureau of Criminal Investigation at the time of his testimony. He testified that his daily duties included examining evidence for DNA samples and comparing those samples to suspects. He also testified that the testing he completed has been accepted as reliable by other experts in the field. Schepler then testified about the Globalfiler testing system BCI adopted in 2016 and that Schepler was trained on in September 2016. He testified that BCI switched to that testing kit because it was more sensitive than the previous testing kit the organization utilized.

{¶ 62} Because the original scientist was not going to be available for trial, the prosecution requested Schepler retest the sample from the winter gloves so that he would be able to testify at trial. He testified that he was completing the same actions the previous scientist interpreted for her report, which was "reviewing all the data, all DNA profiles developed, all the controls, everything that goes into our testing process, and I am drawing my own conclusions." Essentially, the original scientist completed her testing in

24.

2016 and gathered the data that Schepler then interpreted to come to his own conclusions in May 2018. Appellant did not object to the introduction of Schepler's report into evidence.

{¶ 63} Appellant points to *United States v. Williams*, 382 F.Supp.3d 928 (N.D.Cal.2019), to support his position that the Globalfiler testing is not scientifically reliable. In that matter, the court found that the Globalfiler system was not reliable when detecting DNA in more than five-person mixtures. *Id*. at 936-937. The court did not determine that the test was generally unreliable when there were two standards and determined that another test known as Bullet was not reliable either. *Id*.

{¶ 64} We cannot find that the trial court committed plain error when it admitted Schepler's report into evidence. Schepler testified to the three requirements to be qualified as an expert. He testified as to his training and that the subject area of his expertise was outside the knowledge of a lay person. He also testified about the testing that was completed and the ways he ensured the accuracy of the testing. He thus demonstrated the three requirements to testify as an expert under Evid.R. 702. The trial court did not err in permitting Schepler's testimony and report because Schepler testified and that he met the three requirements to testify as an expert under Evid.R. 702. Therefore, the trial court did not commit plain error by admitting this report into evidence. Appellant's third assignment of error is not well-taken.

25.

**4. Trial counsel did not render ineffective assistance by failing to object to the admission of BCI technician's report because the report was scientifically reliable.**

{¶ 65} Appellant argues that trial counsel rendered ineffective assistance of counsel when counsel failed to object to the introduction of the Globalfiler report and testimony of Schepler.

{¶ 66} The Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), laid out a two-part test to determine if a defendant was provided ineffective assistance of counsel. First, a defendant must demonstrate that the trial counsel's conduct fell below an objective standard of reasonableness and that those errors were serious enough to create a reasonable probability, that but for the errors, the result of the trial would have differed. *Bradley* at 142. Trial counsel is entitled to a strong presumption that his or her counsel did not fall below a reasonable standard. *Strickland* at 688.

{¶ 67} We cannot find that trial counsel fell below a reasonable standard for failing to object to a test that was used by the BCI for nearly a year at the time of the trial. Schepler was well qualified as an expert and described the test in detail and the different controls used to ensure the accuracy of the test. Therefore, it was not unreasonable to fail to object to the test at the time of trial. Defendant cannot demonstrate that the outcome of the proceedings would have differed had his counsel objected to the introduction of the forensic report. Therefore, appellant's fourth assignment of error is not well-taken.

26.

**5. Appellant's convictions were supported by sufficient evidence.**

{¶ 68} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted). *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). When making such a determination, an appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

*Convictions Relating to the Crimes Against A.D.*

{¶ 69} Appellant was charged with the aggravated murder of A.D. in violation of R.C. 2903.01(B) and (F) which prohibits a person from purposely causing the death of another while committing or attempting to commit aggravated robbery or aggravated burglary. A person acts purposely when "it is the person's specific intention to cause a certain result." R.C. 2901.22.

{¶ 70} Appellee presented sufficient evidence that appellant purposely caused the death of A.D. A.D. was struck several times with the butt of a gun and stabbed several times, which caused his death. The way A.D. died demonstrated the murder was committed purposely. Appellee presented evidence that appellant was in possession of several of A.D.'s items which linked him to the crime scene and A.D. Further, appellee presented sufficient circumstantial evidence that appellant committed aggravated robbery

27.

or burglary in the trailer against A.D. because a witness saw appellant in possession of some of A.D.'s stolen items, some of A.D.'s personal items were found near appellant's property in the woods, and A.D. suffered both physical harm from blunt force trauma and serious physical harm from being stabbed. A.D. was found naked at the time of his murder which indicated that he was caught by surprise, and because the property was missing, the murder occurred during the process of the robbery. Appellant also told Groll that he robbed one of his friends that was out of town at the time. Finally, appellant lived in the same trailer park as A.D. Therefore, a rational trier of fact could have found the essential elements of the crime were proved beyond a reasonable doubt.

{¶ 71} Appellant was also charged with the murder of A.D. in violation of R.C. 2903.02(B) and 2929.02 which prohibits a person from causing the death of another as a proximate result of committing a first or second-degree felony that is not the crime of voluntary manslaughter or involuntary manslaughter. Appellee presented evidence that appellant caused the death of A.D. while committing aggravated robbery and aggravated burglary, both of which are felonies of the first degree.

{¶ 72} Next, appellant was charged with committing aggravated robbery against A.D. in violation of R.C. 2911.01(A)(3) and (C). R.C. 2911.01(A)(3) and (C) prohibit a person from committing or attempting to commit a theft offense and inflicting or attempting to inflict serious physical harm to another. Serious physical harm includes any physical harm that carries a substantial risk of death. R.C. 2901.01(5)(b). Appellee presented sufficient evidence that appellant committed a theft offense within A.D.'s trailer

28.

by presenting the testimony of Stacy Groll who testified that she saw appellant with some of the items stolen from A.D.'s trailer. Appellee also presented evidence that A.D. suffered serious physical harm when he was stabbed several times, which is physical harm that has a substantial risk of death. Appellee presented evidence that the stolen items were A.D.'s because the items had his name on them, appellant was seen with long guns and DVDs that were believed to belong to A.D. the day after he died, and some of the collectible coin holders A.D. was known to bring home from Las Vegas.

{¶ 73} Appellant was also charged with the aggravated burglary of A.D. in violation of R.C. 2911.11(A)(1) and (B). R.C. 2911.11(A)(1) and (B) prohibit a person from knowingly, by force, stealth, or deception, trespass into an occupied structure with the purpose to commit any criminal offense and knowingly inflict physical harm onto another. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶ 74} Appellee presented evidence that appellant entered the trailer by stealth and committed physical harm to A.D. when he struck A.D. with the butt of the gun. Appellant entered the trailer by stealth because A.D. was surprised by the entrance of appellant and appellant was not invited into the trailer. The trailer was occupied at the time appellant entered as A.D. was there. Appellant knowingly inflicted physical harm onto A.D. when he struck A.D. as he was aware his conduct would probably cause physical harm to A.D.

29.

{¶ 75} Finally, appellant was charged with receiving stolen property in violation of R.C. 2913.51(A) and (C) which prohibits a person from knowingly receiving, retaining, or disposing of a motor vehicle when the person knows or has reasonable cause to know that the vehicle was stolen. Appellee presented evidence that A.D.'s jeep was stolen from his trailer. The keys for the jeep were never recovered. The jeep was recovered less than a mile away from A.D.'s trailer. Appellant was linked to the jeep by black winter gloves found on the path from the jeep to Stacy Groll's house from the DNA obtained in the winter gloves. Appellant had reasonable cause to know the jeep was stolen because he stole the vehicle.

*Convictions Relating to the Crimes Against T.M.*

{¶ 76} Appellant was also charged with the aggravated murder of T.M. in violation of R.C. 2903.1(B) and (F). Appellee demonstrated the appellant was near the crime scene near the time T.M. was murdered and the fire was set. Stacy Groll testified that appellant was at T.M.'s apartment the night that T.M. was murdered and appellant confirmed that he was there that night working on a light fixture at T.M.'s apartment. Evidence was also presented that T.M. was purposely killed because he was stabbed many times prior to the fire being set. Appellee also presented evidence that appellant committed aggravated robbery while in the apartment of T.M. as T.M. suffered from serious physical harm during appellant's attempt to steal items from T.M. T.M.'s belongings were also found near the same area where appellant's items and the stolen items from A.D. were found.

30.

Therefore, appellee presented sufficient evidence that appellant committed the aggravated murder of T.M.

{¶ 77} Appellant was also charged with the murder of T.M. in violation of R.C. 2903.02(B) and 2929.02 because T.M.'s death was caused as a proximate result of committing a felony of the first degree, which in this matter was aggravated robbery. T.M.'s death was a proximate result of the felony being committed as they happened simultaneously, and the murder assisted in the crimes being committed.

{¶ 78} Appellant was further charged with the aggravated robbery of T.M. in violation of R.C. 2911.01(A)(3) and (C). Appellee presented evidence that appellant inflicted serious physical harm on T.M. as the multiple stab wounds constitute physical harm that carries a substantial risk of death. Evidence was presented that appellant committed theft against T.M. as stolen items were found near appellant's home, his items, as well as items from A.D.

{¶ 79} Finally, appellant was charged with aggravated arson in violation of R.C. 2909.02(A)(1), (B)(1), and (B)(2) which prohibits a person from knowingly creating a substantial risk of serious physical harm to another by means of fire or explosion. A fire investigator testified at trial and stated that in his opinion that the fire was started intentionally by a human hand. The fire created a substantial risk of serious physical harm to another as a person was in the apartment and was unaware of the fire being set. The mere fact that the only evidence connecting appellant with the fire is circumstantial does

31.

not equate to a lack of sufficient evidence. Therefore, there is sufficient evidence for appellant's convictions.

**6. Appellant's convictions were not against the manifest weight of the evidence.**

{¶ 80} "While sufficiency of the evidence examines whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Crawford*, 6th Dist. Lucas No. L-17-1296, 2019-Ohio-3123, ¶ 46, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. The appellate court must sit as the "thirteenth juror" and scrutinize the factfinder's resolution of the conflicting testimony. *Thompkins* at 387. When reviewing an appellant's claim that a verdict is against the manifest weight of the evidence, an appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* A conviction should be reversed on manifest weight grounds only in the most "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*

> A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial. The determination of weight and credibility of the evidence is for the trier of fact. The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and

determine whether the witnesses' testimony is credible. The trier of fact is free to believe or disbelieve all or any of the testimony. Consequently, although an appellate court must act as a 'thirteenth juror' when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the fact finder's determination of the witnesses' credibility. (Citations omitted). *State v. Carson*, 10th Dist. Franklin No. 05AP-13, 2006-Ohio-2440, ¶ 15.

{¶ 81} Based upon the testimony and evidence presented at the trial, we cannot find that the jury lost its way when it determined that appellant was guilty of these charges. As stated above, appellee presented evidence and testimony that related to each charge. The jury determined that Groll was credible and decided to rely on her testimony over that of appellant's. We extend special deference to credibility findings by the jury given the benefits the jury had in viewing the witnesses and observing their body languages.

{¶ 82} Although appellant's testimony and evidence contradicted some of Groll's testimony, provided a manner in which he could have left DNA on the gloves recovered near A.D.'s jeep, and described three men that entered T.M.'s apartment the night he was murdered, the jury determined that the other evidence presented by appellee was more credible. The evidence presented by appellee placed appellant at both crime scenes, demonstrated that appellant made inconsistent statements to police, and that evidence of both crimes was found near appellant's personal property. Appellee also presented evidence as to how the victims died and how the fire was started.

33.

**{¶ 83}** Therefore, we cannot find that appellant's convictions were against the manifest weight of the evidence. Appellant's fifth assignment of error is found not well-taken.

**7. The trial court did not commit plain error in failing to merge the charges of aggravated robbery and aggravated burglary relating to A.D. and did not commit plain error by failing to merge the charges of aggravated robbery and aggravated murder as they relate to both victims.**

**{¶ 84}** Appellant was convicted of aggravated robbery which prohibits a person while they are committing, attempting to commit a theft offense, or fleeing from an attempt to commit a theft offense, from inflicting, or attempting to inflict serious physical harm to another. R.C. 2911.01(A)(3). Appellant was also convicted of aggravated burglary which prohibits a person by force, stealth, or deception, from trespassing into an occupied structure, when another person is present, with the purpose to commit any criminal offense and inflicting, or attempting to inflict, physical harm onto another person. R.C. 2911.11(A)(1).

**{¶ 85}** The Double Jeopardy Clause of the Fifth Amendment protects individuals against "(1) 'a second prosecution for the same offense after acquittal,' (2) 'a second prosecution for the same offense after conviction,' and (3) 'multiple punishments for the same offense.'" *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10, quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989).

34.

**{¶ 86}** R.C. 2941.25 codifies these protections in Ohio and provides "[w]here the same conduct by defendant can be construed to constitute two or more allied offense of similar import, the indictment or information may contain counts for all such offense, but the defendant may be convicted of only one." R.C. 2941.25(A). "But R.C. 2941.25(B) states that the *same conduct* can be separately punished if that conduct constitutes offenses of *dissimilar* import. R.C. 2941.24(B) sets forth three categories in which there can be multiple punishments: (1) offenses that are dissimilar in import, (2) offenses similar in import but committed separately, and (3) offenses similar in import but committed with separate animus." *Ruff* at ¶ 20.

**{¶ 87}** "Offenses are not allied offenses of similar import if they are not alike in their significance and their resulting harm." *Id*. at ¶ 21. A defendant's conduct that constitutes multiple offenses against a single victim can support multiple convictions if the harm that result from each offense is separate and identifiable from the harm of the other offense.

A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed? If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance – in other words, each offense caused separate, identifiable

harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation. *Ruff* at ¶ 25.

{¶ 88} The Ohio Supreme Court has established a two-step test to determine whether offenses are allied offenses of similar import under R.C. 2941.25(A). First, we must examine "'whether it is possible to commit one offense *and* commit the other with the same conduct.' If the answer is yes, we must then determine 'whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind."'" (Citations omitted). *State v. Pope*, 6th Dist. Lucas No. L-12-1168, 2013-Ohio-4091, ¶ 20.

> Thus, when determining whether two offenses were committed with a separate animus, the court must consider (1) whether the first offense was merely incidental to the second offense or whether the defendant's conduct in the first offense demonstrated a significance independent of the second, and (2) whether the defendant's conduct in the first offense subjected the victim to a substantial increase in the risk of harm apart from that involved in the second offense. *State v. Gay*, 8th Dist. Cuyahoga No. 101749, 2015-Ohio-1832, ¶ 20, quoting *State v. Bailey*, 8th Dist. Cuyahoga No. 1000993, 2014-Ohio-4684, ¶ 35.

{¶ 89} When a defendant uses greater force than necessary to complete a crime, the defendant demonstrates separate animus. *Gay* at ¶ 22, quoting *Bailey* at ¶ 36.

36.

Separate conduct or separate animus may occur when a court determines that 'defendant at some point broke "a temporal continuum started by his initial act."' * * * Alternatively, a separate conduct or animus may exist when 'facts appear in the record that 'distinguish the circumstances or draw a line of distinction that enables a trier of fact to reasonably conclude separate and distinct crimes were committed. (Citations omitted.) *State v. Woods*, 6th Dist. Lucas No. L-13-1181, 2014-Ohio-3960, ¶ 35, quoting *State v. Nuh*, 10th Dist. Franklin No. 10AP-31, 2010-Ohio-4740, ¶ 16.

{¶ 90} This court has previously decided that it is possible that the same conduct could lead an individual into committing the charges of aggravated robbery and aggravated burglary. *Pope* at ¶ 21. We therefore must look at the conduct of the defendant to determine if the two charges were committed by the same conduct.

{¶ 91} We generally review a trial court's determination to merge convictions de novo. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 23, citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 1. However, when a defendant fails to raise the issue of allied offenses before the trial court, our review is limited to plain error review. *State v. Jackson*, 6th Dist. Lucas No. L-17-1228, 2019-Ohio-577, ¶ 28, citing *State v. Roberson*, 2019-Ohio-1955, 113 N.E.3d 204, ¶ 12 (6th Dist.). To demonstrate plain error, the appellant "'must "demonstrate a reasonable probability that the convictions are for allied offenses of similar import

37.

committed with the same conduct and without a separate animus," and "absent that showing, the accused cannot demonstrate that the trial court's failure to inquire whether the convictions merge for purposes of sentencing was plain error."'" *Id.*

{¶ 92} At sentencing, appellant requested the trial court to merge each murder charge with each aggravated murder charge, with the remaining counts to be served concurrently with the sentences for aggravated murder. The trial court sentenced appellant as requested. We therefore will review appellant's arguments in regards to allied offenses for plain error.

*Aggravated Burglary and Aggravated Robbery of A.D.*

{¶ 93} Appellant next argues that his convictions for aggravated robbery and aggravated burglary which related to the death of A.D. should have merged at sentencing. Appellant argues that the convictions should have merged because the two acts were committed with the same mens rea and with the same act.

{¶ 94} Appellee argues that the charges differ because one charge was a crime against property and one charge was a crime against individuals. Appellee also argues that the harm of burglary is separate from the harm of robbery. Finally, appellee argues that the crimes should not have merged because A.D. suffered several kinds of attacks and those attacks took place in different locations because A.D. was beaten with the gun and then he later suffered fatal stab wounds near the bathroom. As appellee argues, aggravated burglary was committed when appellant trespassed into A.D.'s home with the

intent to commit a crime and then inflicted physical harm on A.D. by bludgeoning A.D. with a firearm.

{¶ 95} We cannot find that the trial court committed plain error when it did not merge the charges of aggravated burglary with the charge of aggravated robbery because appellant has not demonstrated that there is a reasonable probability that these charges were committed with the same conduct or with the same animus. When appellant struck A.D. with the gun, he satisfied the aggravated burglary charge's physical harm element and completed the offense. Later when appellant stabbed A.D., he satisfied the aggravated robbery charge's serious physical harm element and completed that offense. Since the aggravated burglary was complete when appellant struck A.D. with a gun, the subsequent act of stabbing him to death was unnecessary to complete the aggravated burglary. Thus, the aggravated robbery was committed with separate conduct. Appellant's sixth assignment of error is not well-taken.

*Aggravated Murder and Aggravated Robbery of A.D. and T.M.*

{¶ 96} Appellant also argues that his convictions for the aggravated robbery and murder of A.D. should have merged as well. Appellant argues that the same harm occurred, the murder of A.D. from both crimes.

{¶ 97} Appellee argues in return that the charges of aggravated murder and aggravated robbery are not similar in import or significance as one charge is a crime against property and another involves the taking of a life. Appellee argues that there was

39.

a separate animus behind the aggravated murder charge because the jury found that appellant had the specific intention to kill when he committed the murder.

{¶ 98} We also cannot find that the trial court committed plain error when it failed to merge these charges. Appellant has not demonstrated a reasonable probability that the offenses were committed with the same animus. By finding appellant guilty of aggravated murder, the jury found that appellant killed A.D. and T.M. with the specific intention of killing them during the course of the aggravated robbery. *See State v. Riggins*, 1st Dist. Hamilton No. C-180069, 2019-Ohio-3254, ¶ 49, citing *State v. Flagg*, 1st Dist. Hamilton No. C-140579, 2018-Ohio-1702, ¶ 39. Therefore, the trial court did not commit plain error when it failed to merge these charges. Appellant's seventh assignment of error is found not well-taken.

## Conclusion

{¶ 99} We affirm the judgment of the Lucas County Court of Common Pleas. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                              _____

                                                          JUDGE

Thomas J. Osowik, J.

                                                      _____

Christine E. Mayle, J.                               JUDGE
CONCUR.

                                                          _____

                                                          JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.