[Cite as *State v. Gunn*, 2021-Ohio-2253.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                            Court of Appeals No.  L-20-1034

      Appellee                                      Trial Court No.  CR0201902746

v.

Andrew Douglas Gunn                          **DECISION AND JUDGMENT**

      Appellant                                     Decided:  June 30, 2021

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Breyman, Assistant Prosecuting Attorney, for appellee.

Emil G. Gravelle, III, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Defendant-appellant, Andrew Gunn, has appealed the January 8, 2020

judgment of the Lucas County Court of Common Pleas which, following a jury trial

convicting him of robbery, sentenced him to a minimum term of six years of imprisonment. For the reasons that follow, we affirm.

{¶ 2} On October 4, 2019, appellant was indicted on one count of robbery, R.C. 2911.02(A)(2) and (B), a second degree felony. The charge stemmed from an incident on September 25, 2019, where appellant, after allegedly taking his girlfriend's automobile without permission and injuring her in the process, led police on a high speed chase which ended after he crashed the vehicle. Appellant initially entered a not guilty by reason of insanity plea which was withdrawn and a not guilty plea entered on November 13, 2019.

{¶ 3} A jury trial in the matter commenced on January 6, 2020. During voir dire, the state used a peremptory challenge to remove an African-American juror; the court denied appellant's *Baston* challenge. Despite the victim's lack of cooperation while testifying, appellant was found guilty of the charge. This appeal then followed with appellant raising three assignments of error for our review:

1. The trial court erred in denying appellant Andrew Gunn's *Baston* challenge of an African American juror being removed from the jury.

2. Appellant's conviction for robbery was based on insufficient evidence.

3. Appellant's conviction for robbery was against the manifest weight of the evidence.

2.

## Baston Challenge

{¶ 4} Appellant's first assignment of error argues that the trial court erroneously denied his *Baston* challenge of the removal of an African-American potential juror. Appellant contends that the race neutral reason given by the state, that the juror's recent service as a juror in a criminal action where the defendant was found not guilty would impact her ability to properly assess the state's burden of proof, was "clearly erroneous removal because the state did not want a juror of the same color as the appellant who might find the appellant not guilty."

{¶ 5} Addressing the issue of discrimination in the jury selection process, the Supreme Court of the United States articulated a three-step process to analyze whether the exercise of a peremptory challenge was racially motivated. *Baston v. Kentucky*, 476 U.S. 79, 96, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), *applied in* Ohio by *Hicks v. Westinghouse Materials Co.*, 78 Ohio St.3d 95, 676 N.E.2d 872 (1997). The analysis requires that a defendant first demonstrate a prima facie case of racial discrimination in the use of the challenge. *Hicks* at 98, citing *Baston* at 96. Once a prima facie case is shown, the burden then shifts to the state to provide a race-neutral explanation for the challenge. *Id.*, citing *Baston* at 98. Finally is the court's determination of whether the state's explanation is credible. *Id.* at 99, citing *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

3.

{¶ 6} On appeal, we review the trial court's determination "'[a] trial court's findings of no discriminatory intent will not be reversed on appeal unless clearly erroneous.'" *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 53, quoting *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 106.

{¶ 7} During voir dire, the potential jurors were asked whether they had served on a jury in the preceding 12 months; two potential jurors gave affirmative responses. The jurors were individually questioned in chambers regarding their responses. Juror No. 1 indicated that she had served as a juror approximately seven to eight months prior in the same courthouse. She stated that it was a criminal assault case and the defendant was found not guilty. Juror No. 1 stated that the evidence consisted of witness testimony, video and photographic evidence, and medical documents.

{¶ 8} Following voir dire, the state elected to use a peremptory challenge to excuse Juror No. 1, an African-American,[1] prompting appellant's *Baston* challenge and the following discussion:

> [DEFENSE COUNSEL]: Judge, judge, I would – I mean based on her color and my client's color on this case I would raise a <u>Baston</u> challenge on this.

---

[1]Though in a different courthouse, Juror No. 10 indicated that three weeks prior he served as a juror in a criminal assault on a police officer case. The defendant had been found guilty. This juror was also excused by peremptory challenge by the state.

THE COURT: All right. And the reason for the peremptory on no. 1, [prosecutor]?

[PROSECUTOR]: [I]n chambers [Juror No. 1] discussed her prior criminal jury experience within the last twelve months. Was here in this courthouse. She made an – or rendered a not guilty verdict on assault case. This is a case of robbery which involves an element of physical harm being caused. She indicated that her not guilty verdict was rendered despite video, picture and medical evidence. In this case we will have video and photographic evidence. Will not have medical evidence. The State feels that her assessment of what the State's burden of proof is in order to prove a physical harm case would exceed the actual requirements of proof beyond a reasonable doubt and basically her prior vote in a similar case is the State's reason for requesting the peremptory.

THE COURT: Like to respond to any of that, [defense counsel]?

[DEFENSE COUNSEL]: Judge, just in general terms, in fact it was asked if the service would be any difficulty to her. It's not. As to the presumptions that the State made, I guess no comment on those.

THE COURT: [Juror No. 1] did indicate she served in the past seven or eight months on a criminal trial down the hallway with Judge Gary Cook. And as [the prosecuting attorney] pointed out, the evidence that she

referred to is some of the evidence or types of evidence that will be referred to allegedly in this case. Although I'm unaware of what the exact evidence will be, the State makes that representation. I find that there's no cause for Baston challenge to be granted and will deny it as such and allow the State to exercise its first peremptory as to juror no. 1, * * *.

{¶ 9} Reviewing the above discussion, we first find that appellant set forth a prima facie case of discrimination. *Hicks*, 78 Ohio St.3d at 98, 676 N.E.2d 872. Thereafter, the burden shifted to the state to provide a race-neutral explanation for the challenge. *Id.* The state did so. We conclude that the court's finding that the explanation was credible was not clearly erroneous. *See State v. Swain*, 6th Dist. Erie No. E-12-079, 2014-Ohio-1308, ¶ 23 (two potential African-American jurors were properly excused because they indicated that they would hold the state to a higher standard of proof than required.). Appellant's first assignment of error is not well-taken.

## Evidence at Trial

{¶ 10} Toledo Police officer Carlyle Gafeney testified that on September 25, 2019, in the area of Langrage and Streicher Streets in Toledo, Lucas County, Ohio, he was on patrol with another officer when he observed appellant drive around another vehicle and run a stop sign. As he was turning the marked police cruiser around to pursue the vehicle, Officer Gafeney observed individuals at the Dollar General store waving, gesturing, and indicating that something had just occurred there. Deducing that the

vehicle in question was involved, Gafeney continued his pursuit down a residential street where he encountered appellant traversing at speeds of 40-50 m.p.h., though the speed limit was 25 m.p.h.

{¶ 11} Gafeney stated that appellant was attempting to negotiate a left turn at a T intersection when he crashed into a tree. Officer Gafeney and his partner approached the vehicle and ascertained that appellant was unconscious; he was transported by ambulance to the hospital. Officer Gafeney then testified that his partner was wearing a body camera which recorded the aftermath of the crash. The video was played for the jury.

{¶ 12} Toledo Police officer Amerra Bryson testified that on September 25, 2019, she responded to a robbery call at the Dollar General store. Officer Bryson spoke with victim S.B; Bryson stated that S.B. was trembling, had a look of "horror" on her face, and was initially incoherent and unresponsive. When she was able to recount the events, she did not speak in logical, coherent sentences.

{¶ 13} After the court determined that S.B's statement was a non-hearsay, excited utterance Officer Bryson summarized that S.B. stated that on the day of the incident, she had just gotten off work and met appellant in the parking lot where he asked for a ride home. As S.B. was driving him, appellant was mumbling: "Why are you doing this to me?" Once at his home, appellant took her keys as he was exiting the vehicle. S.B. indicated that appellant wanted money in exchange for her keys.

7.

{¶ 14} According to Bryson, S.B. stated that the two then proceeded to Dollar General so S.B. could buy something and get cash back to give to appellant. S.B. said upon arriving at the store and in an attempt to get help, she made a telephone gesture using her thumb and pinkie finger when passing a store clerk. The two then retrieved a gallon of milk and went to check out. Officer Bryson testified that at the counter, S.B. again motioned to the clerk to call; he then asked her if she was okay. Appellant answered that S.B. was fine and then took the car keys and walked out of the store; S.B. told the clerk to call the police.

{¶ 15} S.B. told Officer Bryson that she then walked out of the store after appellant to get her keys back. Appellant was in the driver's seat and S.B. stood in the open driver's door. Appellant told her to get in the passenger side door; she refused continuing to request that appellant return her keys. Appellant then backed up knocking S.B. down with the open door.

{¶ 16} Officer Bryson testified that she had a body camera on and recording during the encounter. A portion of the interview was played for the jury and reflected part of the events about which Bryson testified.

{¶ 17} S.B. then testified. S.B. stated that she works for the Toledo Area Transit Authority (TARTA) as a bus driver. S.B. stated that appellant had been a passenger on her bus route for about four years; the two developed a friendship that eventually turned into a romantic relationship. Approximately a week before the incident, S.B.'s husband

8.

found out about the relationship and asked S.B. to break things off. However, the night before the incident, S.B. and appellant were talking by phone and exchanging test messages.

{¶ 18} On September 25, S.B. was on her morning break when she encountered appellant waiting for her as he usually did. S.B. drove appellant to his house where he began asking S.B. why she was doing this to him. S.B. explained that the night before, appellant thought she had someone else in her room when they were talking on the phone. S.B. stated that she denied having anyone there but her dog and that she felt that appellant was under the influence of alcohol. Appellant then hit her but immediately apologized and asked for money.

{¶ 19} After agreeing upon a sum of $50, S.B. first drove to a dollar store on Cherry Street; because they had just opened, they did not have any cash in the register. The pair then proceeded to the store on Lagrange Street. S.B. stated that she gave her keys to appellant when they arrived because he was afraid that she would leave him there.

{¶ 20} Once in the store, S.B. stated that she gestured to the cashier to call police because she wanted appellant to get help for his addiction. S.B. stated that when checking out she mouthed "call the police" to the cashier. She stated that she could tell that the cashier was stalling for the police when he indicated that his register was not working.

9.

{¶ 21} After leaving the store, appellant sat in the driver's seat. S.B. stated that she was pleading with him not to leave because he needed help and was suicidal. S.B. testified that she did not want him to leave but that he backed up and the car hit her and knocked her to the ground. Store security camera footage was played for the jury and S.B. was questioned as to the course of the recorded events.

{¶ 22} Following the conclusion of S.B.'s direct examination, the state brought a telephone call as well as text messages between appellant and S.B. to the attention of the court; the content of the communications was reviewed in chambers. The state then requested that, based on collusion between the parties in violation of court order, S.B. be recalled as a court witness under Evid.R. 611, and the state be permitted to question her using leading questions as if on cross-examination. The court ultimately allowed S.B. to be treated as a hostile witness.

{¶ 23} The state questioned S.B. about the injuries to her lip and leg she received on September 25. Photographs of the injuries were admitted into evidence.

{¶ 24} S.B. was questioned about the October 14, 2019 letter she had written chronicling her version of the September events. S.B. admitted that prior to writing the letter, she and appellant discussed what she would say and that they both felt it was a good idea to have it notarized. S.B. was questioned about omissions from the letter including the injury to her lip caused by appellant striking her, that he knocked her to the ground with the car door, and that she twice signaled a Dollar General employee for help.

10.

S.B. admitted that she read a draft of the letter to appellant and he told her to "clean things up."

{¶ 25} S.B. admitted that since September 25, 2019, she had spoken with appellant by telephone nearly 400 times. S.B. agreed that appellant told to her to save him; she stated that she was trying. She admitted that since being in jail, appellant sometimes called her using someone else's identification number.

{¶ 26} During cross-examination, S.B. explained that during the course of the events her fear was appellant's depressed mental state and his substance abuse and that he was going to hurt himself. She believed that appellant crashing into a tree was evidence of this intent. S.B. further explained that the notarized letter she wrote was not the product of extensive, coached revisions; it just included facts she felt were significant to the case.

{¶ 27} S.B. was asked about whether she felt robbed at multiple points during the incident; each time, she responded negatively. She further indicated that appellant never told her to lie. On redirect examination, S.B. admitted that she never mentioned her fear that appellant would harm himself to the officer or detective who interviewed her.

{¶ 28} Dollar General clerk, Justin G., testified that on September 25, 2019, S.B., upon entering the store with appellant, signaled for him to make a telephone call and mouthed "help me." Justin stated that he initially did not believe her but that when the two came back up to check out she had the "scariest" look on her face. Justin asked S.B.

11.

if everything was okay; he stated that she was too terrified to answer but she got behind appellant and again mouthed the words "help me." Appellant then got angry and asked why Justin was worried about her; he said she was fine.

{¶ 29} After realizing that S.B. was in need of help, Justin testified that he pretended to have a problem with his cash register in an attempt to get assistance and keep the pair from leaving the store. After approximately two minutes, Justin stated that appellant grabbed S.B.'s arm and left the store. He called the police and followed them outside.

{¶ 30} Justin testified that they went to a black Jeep Wrangler and appellant got in the driver's side and shut the door. Justin stated that S.B. opened the door back up and was trying to get him out of the car when appellant shoved her in an attempt to get her to back up. Appellant then put the car in reverse and hit S.B. with the open car door.

{¶ 31} Moments after appellant sped out of the parking lot, Justin flagged down a police cruiser who immediately did a U-turn and pursued the Jeep. Justin then narrated the Dollar General surveillance video depicting the events to which he testified.

{¶ 32} Toledo Police Detective, Jeffrey Sharp, was assigned to investigate the incident. Sharp stated that he interviewed S.B. and Justin G., took photographs, and arranged access to the surveillance cameras.

{¶ 33} Detective Sharp stated that he interviewed S.B. on September 25, 2019, while she was still at Dollar General and had calmed down. He stated that S.B.'s trial

12.

testimony, which he had observed, did not completely reflect what she reported to him during the interview. Specifically, Sharp stated that S.B. told him that she had given appellant money on multiple occasions to support his drug habit and that he was "crashing" or having drug withdrawal symptoms. She did not mention that appellant was suicidal or threatening self-harm. S.B. stated that she felt threatened and manipulated by appellant's attempts to obtain money. During cross-examination, Detective Sharp was questioned as to his interpretation of the word "crashing" and admitted that it could refer to someone with suicidal thoughts.

{¶ 34} At the close of the state's case, appellant made a Crim.R. 29 motion for acquittal which was denied. The defense rested and the motion was renewed and again denied.

{¶ 35} Appellant now argues, in his second and third assignments of error, that his conviction for robbery was not supported by sufficient evidence and was against the weight of the evidence. Insufficiency and manifest weight are distinct legal theories. In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In contrast, when reviewing a manifest weight claim,

13.

"[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 36} As to sufficiency, appellant contends that the state failed to prove the underlying theft offense by sufficient proof that appellant did not have permission to use S.B.'s vehicle. The state counters that its presentation of three alternative theories: intimidation, threat, and/or lack of consent was more than sufficient to support appellant's conviction.

{¶ 37} In order to be convicted of robbery, R.C. 2911.02(A)(2), the state was required prove that "in attempting or committing a theft offense" appellant inflicted, attempted to inflict, or threatened to inflict physical harm on another. The theft offense element prohibits a "person, with purpose to deprive the owner of property or services," from knowingly obtaining or exerting control over either the property or services without

14.

the owner's consent, beyond the scope of the consent, by deception, by threat, or by intimidation.  R.C. 2913.02.

{¶ 38} In asserting that the theft element was not established because he had S.B.'s consent to drive her vehicle, appellant relies on the fact that S.B. gave him her car keys, they had been in a romantic relationship, he had driven her vehicle previously, and that S.B. was trying to stop appellant so he could get help with his addiction, not to prevent him from stealing her car.  Appellant further contends that there was no evidence presented demonstrating that he took control of the vehicle by the use of deception, threat, or intimidation.

{¶ 39} Our review of the testimony and video evidence presented at trial paints a different picture.  The series of events began at appellant's house where the state presented evidence that appellant asked S.B. for money, hit her, and then would only return her car keys if she agreed to get him money.  At the Dollar General store, S.B. twice asked the store clerk to call the police and appeared "terrified."  The testimony of the responding officer and detective further supported S.B.'s mental state following the incident.  In addition, the body camera video of Officer Gafeney showed appellant shaking and barely able to speak.  This evidence demonstrates the intimidation and/or threat factors.

{¶ 40} As to consent, while it is undisputed that S.B. gave her keys to appellant, there was also ample testimony presented that she did not give him permission to leave

15.

the store in her vehicle.  Further, S.B. physically attempted to stop him from leaving the parking lot when she was struck and knocked down by the vehicle's open door.  Thus, we conclude that sufficient evidence established the offense of robbery.

{¶ 41} Appellant next argues that even finding that the conviction was supported by sufficient evidence it was against the manifest weight of the evidence.  Appellant focuses on the fact that S.B. vehemently denied that the events at issue constituted robbery.  After careful review of all the evidence presented, we find that the jury did not err in discrediting S.B.'s testimony and choosing to believe the state's version of the events.

> "A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial. The determination of weight and credibility of the evidence is for the trier of fact.  The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.  The trier of fact is free to believe or disbelieve all or any of the testimony.  (Citations omitted)."

*State v. Lowery*, 6th Dist. Lucas No. L-18-1170, 2020-Ohio-5549, ¶ 80, *appeal not allowed*, 162 Ohio St.3d 1421, 2021-Ohio-1201, 166 N.E.3d 13, quoting *State v. Carson*, 10th Dist. Franklin No. 05AP-13, 2006-Ohio-2440, ¶ 15.

**{¶ 42}** Accordingly, we find that appellant's robbery conviction was supported by sufficient evidence and was not against the weight of the evidence. Appellant's second and third assignments of error are not well-taken.

**{¶ 43}** On consideration whereof, we affirm the January 8, 2020 judgment of the Lucas County Court of Common Pleas. Pursuant to App.R. 24, appellant is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.       

_____
JUDGE

Christine E. Mayle, J.       

Myron C. Duhart, J.       
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.